### KELLY v. LOEW'S Inc.
### Civ. A. No. 5071.

District Court, D. Massachusetts.
March 4, 1948.

Edward F. Flynn, Samuel Abrams and Garrett H. Byrne, all of Boston, Mass., for plaintiff.

Nutter, McClennen & Fish and Edward F. McClennen, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

This is an action of libel brought by a commander of the United States Navy against the producer of the motion picture, They Were Expendable. The parties have waived a jury trial. The complaint refers first to the publication of the script of the cinema, and second to its exhibition at two Boston theatres, Loew's Orpheum and Loew's State, neither of which is owned by defendant. The gist of the three counts is that the portrayal of plaintiff, thinly disguised as the motion picture character, "Rusty Ryan," held him up to ridicule because it showed him engaging in conduct unbecoming an officer and gentleman. Particularly the script and the cinema are said to have shown him, in relation to naval officers and men, as headstrong, undisciplined, aggressive, resistant to orders and self-seeking, and in relation to a United States Army nurse, as unduly amorous. These portrayals are claimed to have damaged him by affecting his professional reputation and thus causing him embarrassment and mental discomfort.

Defendant's answer raises among other points that (1) the script was never published to any one, (2) defendant is not responsible for the showing of the motion picture in the Boston theatres; (3) there is no evidence that any one who saw the picture in Boston did identify Rusty Ryan with plaintiff; (4) neither the script nor the picture holds plaintiff up to ridicule in the eyes of any respectable part of the general public or even of the narrow circle of his own profession; and (5) plaintiff has given defendant a license to portray him as he was shown in the script and in the movie.

Plaintiff was born in New York City, and later lived in suburbs of New York and in Connecticut. He is admitted to be a citizen of one of the states of the United States other than Delaware, in which defendant is incorporated. From Connecticut he was appointed to the United States Naval Academy at Annapolis. He graduated from the Academy in 1935. In December 1941, having attained the rank of lieutenant in the United States Navy, he was stationed at the United States Naval Base at Cavite in the Philippines. At the time he was unmarried. He was the executive officer to Lieutenant Bulkeley commanding Motor Torpedo Boat Squadron Three, popularly referred to as PT boats. The relationship between plaintiff and Bulkeley was respectful and cordial but not intimate—first names never being used between them. PT boats of the type they commanded had by 1941 been used in active warfare by the British, Italian and other foreign navies, but our Navy had no occasion to use them in actual combat prior to the day of Pearl Harbor. There is, however, no reason for finding that in 1941 the United States Navy was skeptical about the usefulness of PT boats or that the persons, including plaintiff, who were assigned to duty aboard such ships regarded or had any occasion to regard the assignment either as unworthy of an able man or likely to limit his opportunities to serve his country or participate in engagements that tested a man's mettle, proficiency and courage.

In the weeks immediately preceding the attack on Pearl Harbor the PT boats in the Philippines, having received indirectly from the Commander-In-Chief warnings that war was imminent, were constantly on patrol. The night before the attack, after having performed his duties, plaintiff went to the Army and Navy Club for a hearty steak dinner, topped off with brandy and a cigar. Then he retired to his bachelor quarters to sleep. Between 2:30 and 4:30 a. m. he was awakened by news of the Japanese raid on Hawaii. Immediately he reported to duty

and in the next few days was under fire from Japanese planes which attacked the Philippines. In these engagements he was not wounded. However, before hostilities had been declared his finger had swollen from the bite of a tropical insect, and after the war was under way plaintiff snagged his finger on some metal, probably on the ladder of one of the boats. (R. 91). He first showed his finger to his bowling companion who was a doctor. Then his commanding officer learned of the injury. After Pearl Harbor day, plaintiff was ordered by Lt. Bulkeley to the Army hospital at Corregidor (R. 102) where he was kept as a patient for about a month and to which during a second and a third month he was required to report as an out-patient two or three times a week. (R. 107, 108).

At the Army hospital there was an Army nurse, holding the rank of second lieutenant, named Peggy. She was one of about 14 nurses assigned to Corregidor where there were approximately eleven thousand men. She was a girl in her twenties of moderate girth and height who wore glasses and who while perhaps not accurately described as "cute" was undeniably attractive to the men at Corregidor.

When plaintiff entered the hospital he fell under the care of Peggy, whose authority or rank he never challenged. From time to time thereafter she ministered to his medical needs. Plaintiff and Peggy became friendly but there is no evidence that there was any romantic attachment or any amorous intimacy. They never ate together except in the hospital. (R. 108). On occasions after plaintiff's discharge from the hospital they went for walks together. And after plaintiff left Cavite, Peggy wrote some letters to him and possibly he wrote to her; but the letters were not in evidence or demanded for production.

After plaintiff was discharged from the hospital he participated in naval engagements of historic importance. The squadron of which Lt. Bulkeley was commander and plaintiff executive officer was assigned tasks of major significance, and never was limited to messenger duty or like routine tasks. In view of the small size of the boats and the limited availability of torpedoes, fuel oil and like supplies, the PT boats performed incredible feats of warfare.

In March 1942, the PT boats were given a mission that became world famous. Lt. Bulkeley, plaintiff and others carried from Cavite to Mindanao General MacArthur, his wife, their son, Admiral Rockwell and other high military and naval personnel. Plaintiff commanded the PT boat which transported Admiral Rockwell. The skill and bravery with which this mission was performed earned each of the PT officers and men the Silver Star.

After arriving at Mindanao the Motor Torpedo Boats continued their superb work of slowing and diminishing the effectiveness of the Japanese advance. It is possible that one of the exploits of Lt. Kelly's boat was the sinking of a Japanese cruiser of the Kuma class. Eyewitnesses ashore believed they saw the cruiser sink, but later reports of naval engagements involving the particular cruiser thought to have been sunk cast some doubt upon the reports of the eyewitnesses. Whatever may be the truth with respect to this particular incident, there is no room for controversy regarding the over-all naval success of the squadron, the danger which the officers and men faced, the casualties they bore and the heroism with which they responded in the nation's most critical hour.

Plaintiff could well testify—though unlike Aeneas he would never volunteer the statement—"Quaeque ipse miserrima vidi, Et quorum para magna fui." (II Aeneid 5). Indeed if one were to select for special notice any particular event in the history of the squadron, the selection made by defendant's attorney could hardly be bettered. Returning from a battle plaintiff's boat became fouled with some coral heads. It was attacked by four Japanese seaplanes (R. 21). The planes killed or injured all except plaintiff and three other members of the crew (R. 22). Plaintiff helped ashore his wounded companions, but the Japanese planes continued strafing the survivors. Acting with incredible presence of mind, dispatch and gallantry plaintiff beached his boat and saved some of his wounded companions (R. 22). Those who

had been lost in the battle were buried in an Anglo-American cemetery after a funeral service performed by a priest but unattended by plaintiff who had other duties to fulfill.

In the spring of 1942 the United States Navy, desiring that its officers and men in the United States should have training in the use of motor torpedo boats by officers familiar with their value in active combat, ordered Lt. Bulkeley, plaintiff and others to the naval training station at Melville, Rhode Island. (R. 79). The transportation from Mindanao was by airplane, and there was no time at which plaintiff offered or thought of offering to disregard his orders and surrender to another the airplane seat which he had been directed to occupy. On arrival in the United States and before reporting to Rhode Island, plaintiff was given a ten-day leave. He went to the home of his mother, who had moved to New York City from Connecticut. After three or four days, the Office of Public Relations of the United States Department of the Navy discovered that plaintiff was in New York City. Despite his own reluctance and because persons holding superior rank in the Navy made it clear that plaintiff should cooperate, plaintiff participated in a parade and two banquets in New York City intended not only as a testimonial of honor to the heroes of the PT boats but also as part of a promotional campaign to sell United States Savings Bonds. (R. 80, 82). This type of display was so out of character with plaintiff's natural disposition that he voluntarily terminated his own leave several days ahead of time and reported for duty at the naval training station in Rhode Island. (R. 26).

Hardly had he reached there when plaintiff was requested by an official of the United States Navy to allow himself to be interviewed by William L. White—a reputable and widely known reporter then on the staff of the periodical, Reader's Digest. (Ex. 1, R. 27, 86). Plaintiff understood that he and his fellow survivors of the PT boats were to tell their stories so that Mr. White could write a factual account for the magazine. For three and one-half days for six or seven hours a day Mr. White asked plaintiff questions. (R. 28). And at the end Mr. White left the station without showing his manuscript or even his notes to plaintiff. (R. 162).

In September or October 1942 plaintiff received an advance copy of a book called They Were Expendable written by William L. White and published by Harcourt, Brace & Co. (R. 88). The book begins with a foreword stating that the author was told the story "largely in the officers' quarters of the Motor Torpedo Boat Station at Melville, Rhode Island, by four young officers"; "because the navy was then keeping him [Lt. Bulkeley] so busy fulfilling his obligations as a national hero, Bulkeley had to delegate to Lieutenant Robert Bolling Kelly a major part of the task of rounding out the narrative. I think the reader will agree that the choice was wise, for Lieutenant Kelly, in addition to being a brave and competent naval officer, has a sense of narrative and a keen eye for significant detail, two attributes which may never help him in battle but which were of great value to this book." And at the end of the book there is a three page table of the real names of the "officers and enlisted personnel attached to motor torpedo boat squadron three". Thus the book purports to be and in fact is a substantially accurate report of "historical events"—as that phrase is used in the letter of December 21, 1942 (Ex. 4) to which reference is made later in this opinion. However, there is in the book some mild profanity which I attribute not to plaintiff but to Mr. White's sense of fitness.

The White book describes with historical fidelity the way news of the Pearl Harbor disaster reached Cavite; the early activities of PT boats; the hospitalization of plaintiff rendering him unable to participate in certain early encounters; plaintiff's role in a Subic Bay enterprise in which Lt. Bulkeley sank a 10,000 ton tanker; the transportation of General MacArthur's party; General MacArthur's promise to get Lt. Bulkeley and other key men out of the Philippines; Lt. Bulkeley's later transportation of President Quezon; the repair of plaintiff's boat; the episode of the possible sinking of a Japanese cruiser of the Kuma class by torpedoes from plaintiff's boat; the beaching and destruction of the boat at

Kawit Island; plaintiff's gallantry in saving his men and crew; the report of the burial mass conducted by a priest after plaintiff had departed; plaintiff's hope that General MacArthur would fulfil his promise to get him out of the Philippines; and the final flight from the Philippine airport to Australia.

Two aspects of the White account require special attention—the author's portrayal of plaintiff's relations to Peggy and of plaintiff's character as an officer.

Mr. White shows the lieutenant and nurse as friendly in a perfectly proper way, and yet with an affectionate concern for one another. Lt. Kelly's first impression of Peggy was that she had "a cute way of telling you very firmly what you had to do". (p. 29). They became companions and they had dates, went together to a party or two and at least once sat at the mouth of Corregidor's tunnel where "every five minutes an army truck would barge tactlessly around the curve". (p. 61). Before he left with the MacArthur party she called him over the signal-corps phone and though he couldn't tell her his mission, he said "I guess it's good-bye, Peggy". (p. 117). Often after they separated his mind went back to her, her plight at Bataan and memories of her gifts of food and drugs for an emergency. As he boarded the airplane to go to Australia he "remembered the last thing she said to me—her voice was just as clear as if it had been two seconds ago, instead of many weeks, over that signal-corps telephone in the army hut on Bataan after I had told her this was good-bye. 'Well,' she said, 'it's been awfully nice, hasn't it' ". (p. 205).

Mr. White shows plaintiff as a man of magnificent courage and deep feeling but at no time out of control of himself. This self-restraint is indeed almost a salient characteristic. Thus when, accompanied by a colonel, plaintiff was sent to report to a general at the American Club the important news of the loss of the PT boat and some of his men, and of the PT's sinking of a Japanese cruiser, he was kept waiting an unconscionable time. Though the plaintiff got mad, apparently inside, he does not appear to have moved a muscle externally except to go over and have a Coca-Cola with the colonel. (p. 178). Another time when an army colonel assigned him the duty of leading fifty carabao—that is, milk cows—after they were rounded up, plaintiff "didn't say much"; he waited to see if the order would not be superseded by his right to take the expected plane; and by waiting, the conflict was avoided. (p. 197). In short, Mr. White's impression—like the one I myself gathered from plaintiff's appearance in court—is that he has unusual steadiness of temper.

Since the true names of the plaintiff and the others were set forth in the foreword and in the body of Mr. White's book, I find that their names and identities became widely known in book-reading communities, such as Boston and its suburbs.

Recognizing the dramatic value of the book, a score of representatives of motion picture producers approached plaintiff, who was still on duty in the continental United States, to secure his permission to portray his character and exploits on the screen. Plaintiff repeatedly refused. I find that his primary reason was his natural reserve and distaste for self-advertisement; his secondary and distinctly minor reason was that the publicity might operate to prejudice his professional career. To meet that second objection, Honorable Frank Knox, a former newspaper publisher, then Secretary of the Navy, on December 15, 1942 wrote a letter directly to plaintiff stating that the proposed motion picture "seems to be for the best interests of the Navy Department. A copy of this letter has been forwarded to the Bureau of Personnel for inclusion in your official record." [Ex. 3]. Reading between the lines of that letter, plaintiff understood and I conclude that a reasonable person would have understood that the letter was the equivalent not of a command but of a peremptory preference carrying overtones of possible consequences if the writer's pleasure or displeasure were awakened by the recipient's reaction.

Even after receiving Secretary Knox's letter, plaintiff desired to limit the license which he would give defendant as the producer of the motion picture, They Were Expendable. He rejected various drafts of a proposed license which were submitted to

him. (R. 116). Finally, on December 21, 1942 he signed a letter which he did not write and which was submitted to him by the Office of Public Relations of the United States Navy which in this instance was, I find, acting on behalf of the motion picture producer which was the intended beneficiary of the license. The text of the letter is as follows:

(Undated)

"Loew's Incorporated
 1540 Broadway
 New York, N. Y.

Dear Sirs:—

I am one of the Navy officers of whom Mr. White wrote in his book 'They Were Expendable.' You are proposing to produce this book, or your version of it, in motion pictures and television and radio performances, but the law in some of the states is that before you impersonate me or use a character that would correspond to me, you need my approval. I now waive, as to you and your assigns and licensees, all personal rights and objections to any use to be made of me or my personality which has the approval of the United States Navy. If the Navy approves, then so far as I am concerned I can be depicted or a character used that may correspond to me, in pictures, radio and television performances and their publicity, with such action, depiction, dialogue and story (fictional or actual), as passes Navy approval. As to name, any name except my exact name can be used for this character that meets Navy approval, even if it is similar to my real name.

This release is granted by me subject to your agreement that the romance shall not be elaborated beyond the portrayal of it in the book and, if possible, shall be played down; and that the historical events in the picture shall be portrayed as accurately as possible in such a screen dramatization.

Yours very truly,
s/ Robert B. Kelly"

Some time passed and plaintiff's mind was on matters far removed from the motion picture world. On May 28, 1944 plaintiff married Miss Hazel Babcock Watts, who was living with her parents in their home in Malden, Massachusetts. He secured a short leave and he and his bride spent part of their honeymoon, perhaps a fortnight, in her parents' home. He met then, as he had met previously when he was courting his future wife, her family and friends who were living in the Greater Boston area.

Afterwards plaintiff and his wife went to Florida where he was officially stationed. In that Florida neighborhood defendant happened to be taking some of the "shots" for the film, They were Expendable. Plaintiff's recollection being refreshed by hearing of that enterprise, he determined to call upon defendant's officers at Culver City, California, when, a few weeks later, he and his wife were in San Diego preparatory to plaintiff's departing for the Far East to participate in the Okinawa campaign and occupation.

On arriving in California in February 1945, plaintiff conferred with Messrs. Wead and Reed, employees of defendant. Wead was a former commander in the United States Navy who, after having been crippled in service, retired to become an employee of defendant in producing motion pictures concerned with naval subjects. Wead and Reed sent for the script of They Were Expendable. Both of them examined it. (R. 53). One of them, probably Reed, handed the script to the other, probably Wead, who in turn handed it to plaintiff. Wead expressed confidence that plaintiff would be satisfied with the script and suggested that plaintiff should notify him if he had any comments.

On returning to his hotel, plaintiff hastily leaved through the pages of the script. He read perhaps a third or a quarter of it, and up to then found nothing that gave him pain. In the confusion of departure, the script was put in Mrs. Kelly's bag, not in plaintiff's. Later Mrs. Kelly sent the script to her husband but he did not read it until June, 1945, after the Okinawa campaign. At once he wrote a letter of protest to defendant. Defendant's representative replied that the picture had reached the cutting stage and that it was too late to alter it, but that the representative was confident that plaintiff would be satisfied.

In January 1946, the motion picture, They Were Expendable, as produced by defendant, was exhibited in Loew's State

480

and Loew's Orpheum in Boston and was seen by large crowds—though there is no evidence as to any particular person or class of persons who attended the performances. Following the showing plaintiff was in the Greater Boston area and at social and like gatherings he often felt embarrassment, uneasiness and self-consciousness in seeing such acquaintances and meeting such new persons as had seen the portrayal of him in the movie. (R. 67).

At some unspecified time, whether before or after the showing of the movie does not appear, plaintiff was awarded the Navy Cross and a number of other unsolicited medals, including the Silver Star medal with Gold Star in lieu of second award, the China Service medal, the American Defense medal, the American Theatre of Operations medal, the Asiatic-Pacific Theatre of Operations medal and the World War II Victory medal (R. 68). Also on his own application he was in 1946 awarded the Purple Heart on account of the snagged finger which led to his hospitalization. Since the summer of 1946 and pursuant to orders issued in May 1946, plaintiff has been serving as an instructor in the Department of Marine Engineering at Annapolis. (R. 69). He has in the meantime attained the permanent rank of Commander in the United States Navy.

The picture, They Were Expendable, opens with the statements that it is based upon the book, They Were.Expendable, by William L. White, and that it was produced under the direction of Commander John Ford, U.S.N., and with the cooporation and assistance of the United States Navy. It concludes with a list of the characters, of which in the order given by defendant, the first is "Lt. Brickley" played by Robert Montgomery and the second is "Lt. 'Rusty' Ryan" played by John Wayne. And there is the customary legend that "The events, characters and firms depicted in this photoplay are fictitious. Any similarity to actual persons, living or dead, or to actual firms is purely coincidental."

Between the start and the end of the film the story is given in the following form. The PT boats were a new venture in 1941. Regular naval officers looked upon them with skepticism. But Brickley had great faith in them and had induced his intimate friend, Ryan, to stake his career on their future. When first reviewed by high officers in the Philippines, the squadron received such a cold reception that Ryan decided that Brickley was overenthusiastic and that the PT boats would never be recognized for their value. Immediately he went to a bar to write out his request for transfer from PT duty to destroyer duty. He was about to present the request when the announcement came in the bar that Pearl Harbor had been attacked. Ryan at once changed his mind and tore up the request for a change of assignment. They both reported to the admiral in charge of Cavite. He then gave the PT boats only messenger and ferry service. Ryan was put out; kicked a can in disgust; and showed general displeasure. However, he remained with the squadron. And shortly afterwards while dining with his fellows, he and they heard a Japanese air attack coming. All hurried to the PT boats, put them out to sea, and at once were bombed by Japanese planes. In this engagement Ryan got shrapnel in his arm.

At first Ryan ignored the arm wound. One day he and Brickley were summoned by the admiral to discuss an important combat task. Both received assignments. Ryan proposed to ignore his wound. Brickley, however, became aware of its importance and sent him to the Corregidor hospital. An attractive, slim nurse, holding the rank of second lieutenant and named " 'Sandy' Davis", ordered him to lie down and put on a blanket. At first Ryan objected and inquired as to her rank. She reminded him of her authority as a nurse. He obeyed, lay down and covered himself with a blanket. She and an orderly pulled off his trousers in a perfectly proper way. There seemed to be no sympathy between the nurse and Ryan. Another patient who was an onlooker said that every man in the hospital was fond of Sandy.

Some days later there was a dance to give the nurses some recreation. Initially Ryan, when asked by Sandy, said he didn't dance and wouldn't go to the dance. After strains of music reached him, Ryan strolled over to the dance hall. Sandy asked him if he really didn't dance. He

said he did. They danced and then they went out on a porch and sat down. In the picture she nestled close to him. In the tradition of the third chapter of Genesis, the female took the lead. But so far as defendant's film shows, Ryan did no more than offer a comforting arm and hand.

The film then showed plaintiff returning to PT duty. His boat as well as others participated in stirring naval engagements, including the battle with the Japanese cruiser and the later bombardment and destruction of Ryan's PT boat by Japanese planes. In one of these scenes Ryan acts heroically saving his wounded companion from strafing by Japanese seaplanes. After that attack has concluded there is a funeral for those of Ryan's crew who died. No priest is available. So the survivors assemble in a Catholic church where Ryan as senior officer conducts the service by saying a few words and reciting a moving poem. An enlisted man, after requesting Ryan's permission, plays "Taps" on his harmonica. Overcome with emotion, Ryan leaves during the final notes of "Taps" and rushes to a neighboring bar. The proprietor is about to close for the day. Ryan seizes a bottle of liquor from the proprietor's basket, makes him re-open the bar, sits down at a table and pours out two drinks for himself. Others of the crew drink at the main bar.

In one of the intervals between the battles comes the assignment of Brickley and Ryan to carry from the Philippines dignitaries whose identity is not at first disclosed. As they are about to leave Cavite, Ryan tries to get Sandy on the telephone to say good-bye. They start talking but the connection is interrupted by the wires being torn down by army officers or men. Ryan goes to his boat. One of his juniors has the helm. When Ryan sees who the dignitaries are, he shoves his junior aside and takes the wheel. The boats safely transport the principal personages, General MacArthur and his family and an Admiral called "Blackwell".

Finally there is an order from Washington directing Brickley, Ryan and two others to return to the United States to discuss with high naval officials the value of PT boats and their performance. Brickley and Ryan are reluctant to leave their associates who have not been similarly removed from danger. But they nonetheless bid their companions farewell in a moving scene in which the Chief Boatswain's Mate who is left behind wounded says "The book doesn't mean much out here so I'm going to say: So long Brick. You've been a swell guy." Brickley replies: "So long, Irish." The Chief Boatswain's Mate Mulcahey says "So long, Rusty". Ryan answers: "So long, you big Mick".

Arrived at the airport, Brickley and Ryan are given seats 27 and 28 in a plane with space for 30. At first the men who should receive spaces 29 and 30 do not appear. Two substitutes are seated. Then, as the plane is about to take off, the men originally assigned for seats 29 and 30 arrive. One of the substitutes as he leaves gives Ryan a message for home. Ryan impulsively offers the substitute his seat and says he, Ryan, "has business" still to do in the Philippines—by which the audience might infer either that Ryan wants to continue fighting or that Ryan has to see Sandy. Brickley intervenes sharply asking Ryan "Who're you working for—yourself." The picture comes to an end.

In substance, the script which was given to plaintiff in California in February, 1945, does not diverge sharply from the final motion picture. There are in the script some more romantic scenes—including one in which Ryan puts his and Sandy's name inside a heart he draws (R. 61, Ex. 5, Sc. 241, p. 92)—and the language and conduct of Ryan toward his fellow officers and his men is a shade more colorful and unrestrained. But for reasons which will become apparent in the course of this opinion I need not dwell on these minor discrepancies.

Looked at in the broadest way, both the film and the script depict Ryan as a gallant officer, zealous to serve the nation, respectful of his superiors, companionable with his equals, considerate of his men, responsive—but not too responsive—to the charms of women. He has the striking virtues of his race—kindliness, generosity, humor, love of his fellow men, impetuous eagerness for action, exuberance of spirit. He is the sort of man that crowds like because they admire his virtues and condone

his faults. They see the brave heart of the hero, the sportsmanship of the open fighter, the quick emotion of the sensitive man. And if they also see hastiness, occasional intemperance, minor infractions of rules, impatience at official blindness, they regard those as being not faults at all or the sort of faults which are the mark of the man of courageous action, the man of large heart, the man who lives by the spirit and not by the letter.

But Ryan appears somewhat differently if he is looked at in the tradition of the professional class of naval officers. He then appears an undisciplined man. Discontented with a PT boat assignment which seems to lead neither to glory nor the grave, he impatiently prepares a request for transfer. He gives vent to his feelings by kicking around cans. He reprimands men in public. He resents and at first resists the authority which an army nurse has over a patient in any army hospital. He shoves a man away from the helm of his boat. He loses his composure when conducting ceremonies for the dead. He seeks consolation for his grief not merely by going to a bar, but by requiring the bar-keep to remain open and by seizing from his possession a bottle of liquor. He fraternizes with his commanding officer and with his men. He is, until reminded of his duty, prepared to ignore the order that he return to the United States merely so that he can attend to his own personal business with a girl. Viewed from the professional aspect Ryan may be a hard fighter of noble character, but he does not measure up to the, shall I say, "regulation" model of a good officer.

On the facts as I have just stated them, these are my conclusions of law.

■ 1. This case is properly removed into the United States District Court on the basis of diversity of citizenship. I find that plaintiff is a citizen of Massachusetts (R. 35), and defendant a Delaware corporation, and there is at stake a controversy involving, exclusive of costs and interest, more than $3,000.

■ 2. In this proceeding I am required to follow the principles of conflict of laws which prevail in the state courts of Massachusetts. Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Hartmann v. Time, Inc., 3 Cir., 166 F.2d 127. The ordinary rule of conflicts invoked by Massachusetts in tort cases is to apply the law of the place of the wrong. Murphy v. Smith, 307 Mass. 64, 29 N.E.2d 726; National Fruit Product Co. v. Dwinell-Wright Co., D.C.Mass., 47 F.Supp. 499, 504.

■ There is no difficulty in applying that ordinary rule to count 1. That related solely to the script; and at the trial the only evidence offered of a showing of the script was evidence of a showing in California. Thus California law would be applied by Massachusetts to that transaction. Murphy v. Smith, supra.

Greater complexity arises in connection with counts 2 and 3. Complaint was made in those counts and evidence was received on those counts with respect to showings of the film itself solely in two Massachusetts theatres during specified weeks.

If complaint had been made of showings not only in Massachusetts, but elsewhere, the Massachusetts court would have been clearly faced with the need of determining whether to regard the conduct complained of as a single tort [see, for example, the Pennsylvania rule referred to in Hartmann v. Time, supra] or as multiple torts [see, for example, Hartmann v. American News Co., D.C.Wis., 69 F.Supp. 736, 738, 739]. If it took the single tort view the Massachusetts court would presumably regard as "the publication" not the circulation of the script (which admittedly differed from the movie), nor the circulation of the "continuity" of the film, nor the first showing of the picture to the producer's employees, but rather the first showing of the picture to the public. Then the Massachusetts court would have to determine whether the law to be applied to that "publication" was the law of the place of production, or the law of the place of the first showing of the film to the general public, or the law of plaintiff's domicil, or the law of the place where plaintiff enjoyed his principal reputation, or some other law. Note, 60 Harv.L.Rev. 941. See also 59 Harv.L.Rev. 136. So far as I am aware, the law books give no indication how the Massachusetts

state courts would decide any of the issues referred to in this paragraph in a case where complaint was made of multiple showings in many states. Indeed, Massachusetts has never indicated whether multiple showings in a single state constitute one or several torts. Holmes, J., specifically reserved the question in Bigelow v. Sprague, 140 Mass. 425, 428, lines 8, 9, 5 N.E. 144, 146: "whether the publication of the edition is to be regarded technically as, so to speak, one composite act, we need not consider."

To be sure, the complaint at bar is limited to showings in Massachusetts alone. The mere fact that the complaint is so limited does not as a matter of logic avoid the problem stated in the preceding paragraph. In other words, logically the Massachusetts court must decide whether such local showings are or are not a part of a composite multi-state tort. The only time the Massachusetts court faced up to that logic it ruled that such local showings were not a part of a single multi-state tort. Commonwealth v. Blanding, 1825, 3 Pick. 304, 311, 15 Am.Dec. 214. In that case defendant printed a defamatory newspaper in Rhode Island, and circulated it there and in Massachusetts. A criminal proceeding was brought in Massachusetts on account of the circulation in Massachusetts. It was held by the Supreme Judicial Court that a separate publication occurred in Massachusetts and was criminally punishable under the law of Massachusetts. This case can of course be distinguished. First, it is a criminal case where local policies may have peculiar force. Second, it is a case which was decided in an age unfamiliar with mass media of circulation such as our modern periodicals, motion pictures and radio broadcasts. Despite these distinctions the case has been followed recently and is sometimes cited for the proposition that a circulation of alleged defamatory material within Massachusetts subjects the circulator to the rules of Massachusetts law.

Indeed, the cases in the United States District Court for Massachusetts based upon its diversity jurisdiction go far to sustain the proposition just stated. Thus in O'Reilly v. Curtis Pub. Co., D.C.Mass., 31 F.Supp. 364, 365, Judge Brewster treated the circulations in Massachusetts (1) as separate from those in Rhode Island and (2) apparently as constituting a composite. "The publication in each of the thirty-eight states gives rise to separate causes of action. The defendant's liability for the libel published in each state is governed by the laws of that particular state. For example, the publication in Rhode Island would support a separate action * * *." In Wright v. R. K. O. Radio Pictures, D.C.Mass., 55 F.Supp. 639, a libel suit in which plaintiff complained only of publications in Massachusetts, though the publication involved a motion picture which had been nationally distributed, Judge Sweeney applied Massachusetts law. In McGlue v. Weekly Publications Inc., D.C.Mass., 63 F.Supp. 744, where complaint was made of circulations in many states Judge Sweeney applied the Massachusetts Statute of Limitations apparently on the theory that all circulation inside and outside Massachusetts was a composite wrong which occurred on the day of the first circulation in Massachusetts. In Curley v. Curtis Pub. Co., D.C.Mass., 48 F.Supp. 29, 30, note 3, where there was a jury trial of a Massachusetts citizen's complaint alleging the circulation in 48 states of an alleged defamatory statement I applied the law of Massachusetts.

The foregoing authorities seem to me to justify my concluding that the Massachusetts rule is that where a person who is domiciled in Massachusetts and whose chief reputation is not shown to have any particular locus complains in Massachusetts of only the circulation within Massachusetts of an alleged defamatory statement, the court applies Massachusetts law. This rule has the merit of simplicity, of readiness in ascertaining the governing precedents and statutes, and of applying the standard of the community where plaintiff's reputation is presumably most affected. This rule does not necessarily imply that every circulation in Massachusetts is part of one composite act, nor that every circulation outside of Massachusetts is part of the same composite act as the circulations in Massachusetts. Such implications might be logically sound and consistent with the rational of the rule

484

as I have stated it. But decision on those implications should await an appropriate case. Before that case arises the problem may be dealt with by local or federal statute. Surely no problem more imperatively requires the attention of those interested in the combined field of torts and conflict of laws.

■ 3. With respect to the script the first serious issue is whether there was any publication at all. On the view of the evidence most favorable to plaintiff the script was shown by defendant to Wead, to Reed, and to clerical, production, theatrical and other internal employees of Loew's. (Of course, the showing to Mrs. Kelly was only by plaintiff, not by defendant.) Publication by one employee of a corporation to another employee has been squarely held by the Massachusetts court to be a publication sufficient for the purposes of a libel suit. Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 348, 349, 47 N.E.2d 595. But the precise issue is whether the same ruling would be made by the courts of the state of California. There appears to be no direct California authority. However, since I am sitting in a diversity jurisdiction case removed from the Massachusetts state courts, since the Massachusetts rule treats an intra-corporate communication of a defamatory statement as a publication, since Massachusetts presumes in the absence of evidence to the contrary that California's common law is like its own [Cormo v. Boston Bridge Works, 205 Mass. 366, 368, 91 N. E. 313] and since Restatement, Torts, § 577, comment (e) and a number of recent cases collated in 166 A.L.R. 114, lend themselves to support of the Massachusetts rule, I shall conclude for the purpose of this case that California also treats an intra-corporate communication of a defamatory statement as a publication.

■ 4. However, the script was published only to persons in the motion picture industry. Even Wead was an employee only of defendant, not of the Navy. And a central question is, if we assume that they identified plaintiff with the character Ryan, was their opinion of him or his reputation lowered or likely to be low-

ered in any way by reading the script? We are in this aspect of the case concerned with what would be the opinion not of the general public nor of naval officers, nor of plaintiff himself, but of persons in the motion picture industry. There is no reason to believe that persons in that industry are peculiarly sensitive to standards of naval discipline, official propriety and etiquette. Nor is there ground for supposing that they hold cool detachment in higher esteem than warmth of heart, vigor of expression and display of intensity of feeling. Hence to that audience the publication of the script—including love scenes somewhat more torrid than those that finally appeared on the screen—was not the publication of anything that held plaintiff up to contempt, hatred or ridicule in their eyes or that lowered their estimate of plaintiff's reputation. To that audience it was not a defamatory statement. Cf. Restatement, Torts, § 559, comment (e), p. 142, lines 3-9; § 569, comment (d); § 614(2).

■ 5. Nor on this record can it be successfully contended that regardless of the views of persons in the motion picture industry, the script was defamatory per se because it depicted plaintiff as engaged in unlawful conduct. It is conceivable that Rusty Ryan by action, gesture or word, may have violated a regulation adopted by the Navy pursuant to statute, and may thus have committed an offense punishable by court-martial. But the pleadings and the testimony at bar point to no such violation. It is not the task of the Court to search out every naval regulation, to consider whether any part of Ryan's conduct offends that regulation and then to decide whether the insinuation of such offence is for purposes of a libel suit to be regarded as the charge of a crime of the type which if oral makes a statement defamatory per se. Bander v. Metropolitan Life Ins. Co., 313 Mass. 337, 341, 47 N.E.2d 595. Cf. Restatement, Torts, § 571, comment on clause (a), p. 173.

■ 6. Now I turn from the script to the motion picture itself. Defendant first contends that it is not accountable for the showing of the picture at the two

Boston theatres referred to in the complaint. If I understand counsel's argument, it is that one who produces an allegedly defamatory motion picture for exhibition and who distributes it to an exhibitor, is not liable for the injury inflicted by that particular exhibitor's showing. This argument is so preposterous as hardly to require answer and certainly not citation of extensive rebutting authority. The producer intended the very exhibition that occurred. It was not a performance independent of its will but the ultimate end toward which the whole production was directed. That the final exhibitor was technically an independent contractor not an agent of the producer is irrelevant. Merchants' Ins. Co. of Newark, N. J. v. Buckner, 6 Cir., 98 F. 222, 230, 231; Restatement, Torts, § 577, comment (f).

7. If counsel means to imply that defendant is not accountable at bar because plaintiff has embraced in his suit only the injury suffered from the showing in two theatres in Boston and has not embraced other injuries suffered from other showings, also caused by defendant directly, or through agents, or through independent contractors, the answer is equally plain. There is no obligation to complain of all the damages caused by defendant. However, if because of the doctrine of "composite torts" the damages not claimed are part of the same cause of action as the damages that were claimed, then of course a new action will not lie for the unclaimed damages.

8. Defendant next makes the point that plaintiff failed to bear the burden of showing that the audiences in the Boston theatre identified him with the character Rusty Ryan. Physically they did not look alike, as the Court could see by comparing the motion picture with the plaintiff when he was on the stand. Emotionally they did not resemble one another —plaintiff being a man of far greater reserve, composure and dignity. Nominally they were distinguishable—Ryan does not sound like Kelly. But all these distinctions are beside the point. The motion picture recited that it was based on William L. White's book, They Were Expendable; and that book throughout uses Kelly's true name and the author in the foreward and elsewhere makes it plain that Kelly is a living officer identical with plaintiff in this suit. Thus by giving the key—if key were needed—to unlock the mysteries of the picture defendant plainly asked the audience to believe—and I conclude that many of them did believe—that Ryan in the movie was substantially like Kelly in life. The disingenuous legend that the persons and events shown in the picture were fictitious and that any similarity to actual persons living or dead was purely coincidental would not have been treated by the average person or naval officer as any more than a tongue-in-the-cheek disclaimer in view of the express reference by the movie to Mr. White's book, in view of the statement of Navy cooperation and in view of the unmistakable portrayal of General MacArthur, his family and other historic personages, including both Lt. Bulkeley and plaintiff.

9. Related to the last point, defendant seems to suggest that there is no showing that anyone in the Boston audiences personally knew Commander Kelly in 1946. If this is the suggestion, it is without merit. The question is not whether the audience knew Commander Kelly personally, but whether they knew his reputation. That his reputation was known in Boston is demonstrable in two alternative ways: first, his exploits had been reported in Mr. White's best-selling non-fiction book; and second, his exploits had been reported over the radio (Ex. 2, p. 198) and were well known in large cities. Thus in New York City, where he had not lived at least since infancy and which had therefore no reason to have a greater knowledge than Boston would have of him, he was the feature attraction of a parade and two banquets intended to promote the sale of government bonds. Moreover, one would have to be peculiarly blind to the racial and religious composition of Greater Boston, to the understandable pride that every group takes in heroes drawn from backgrounds like its own, and to the conspicuous record which plaintiff had made in the Navy to suppose that Commander

Kelly was entirely unknown to the audiences at the State and Orpheum theatres in Boston.

10. I now turn to what is to my mind the most difficult problem in this case—did the motion picture of They Were Expendable shown at the Boston theatres cause the audiences in those theatres to have a lower opinion of Commander Kelly —did it affect his reputation by causing him to be held up to contempt, hatred or ridicule?

The romantic incidents of Ryan's career certainly could not bring Commander Kelly into even a Puritan's ridicule or disesteem. Ryan's conduct toward ladies would have been becoming to anyone, sailor or civilian, officer or man. His conduct on duty, however, raises more subtle issues. And in resolving them it is important to emphasize one consideration of law and another of fact.

■ In deciding whether a statement is defamatory, the rule is to determine what its effect is upon any respectable, substantial part of the community to which the statement was addressed. Thus if the community or audience includes a professional group to which the subject of the statement belongs, the question is the effect of the statement upon that group with its special professional standards. Mr. Justice Holmes gave an apt illustration in Peck v. Tribune Co., 214 U.S. 185, where he said at page 190, 29 S.Ct. 554, at page 556, 53 L.Ed. 960, 16 Ann.Cas. 1075, "If a doctor were represented as advertising, the fact that it would effect his standing with others of his profession might make the representation actionable, although advertising is not reputed dishonest and even seems to be regarded by many with pride". See accord Restatement, Torts, § 559(e).

And in applying that rule of law to the case at bar, we are to remember that the showing complained of was in January, 1946—a mere four months after hostilities had ceased and at a period when this Court takes judicial notice that the Port of Boston was crowded with permanent officers of the United States Navy, some of whom it may reasonably be inferred went to a motion picture in the production of which the Navy cooperated.

■ Thus the issue narrowly stated is whether to permanent officers of the United States Navy the portrayal of plaintiff as resembling Ryan would tend to lower his reputation. In the light of the lack of evidence that Annapolis men were in the audience it would not seem proper to confine the professional group whose opinion we are testing to the narrow circle of those who had graduated from the Naval Academy. And obviously it would be improper to use plaintiff's personal reaction except so far as it is typical of any naval officer's reaction as the test whether the portrayal held him up to contempt, hatred or ridicule.

The testimony warrants this Court in finding and the Court finds that as a group naval officers like other professional groups, such as doctors, lawyers or judges have a standard of judgment of their colleagues which is peculiar to their profession and which differs sharply from the appraisal of the uninitiated. (Cf.R. 8, 13-14, 16, 24, 25, 122, 134-135, 142-143). As plaintiff's counsel suggested at the bar, this difference can be shown by analogy. Suppose a motion picture showed Mr. Justice Holmes on the bench deciding cases in a way that laymen would regard as eminently just and fair, but in a way that lawyers would say showed an unprofessional disregard of statutes, precedents, traditions and canons of judicial conduct. Would not Mr. Justice Holmes, were he alive, have a good cause of action for defamation? To be sure, all professional men have to stomach a certain amount of lay misrepresentation of their virtues. [Cf. Holmes-Pollock Letters: vol. I, p. 106, letter from Holmes to Pollock, Sep. 23, 1902; vol. I, p. 107, letter from Pollock to Holmes, Oct. 3, 1902.] Yet there comes a point when what the layman regards as a statement of virtuous conduct, a professional regards as portrayal of a vice— and not necessarily, from the professional approach, a venial vice. And the law recognizes that the professional man's interest in not having added to his career imaginary facts that tend to lessen his colleagues' opinion of him, rises superior

to the motion picture producer's interest in embellishing a true story with colorful episodes not plainly stamped as imaginary but designed to increase the popularity of the motion picture.

Yet it is said by defendant's counsel that the motion picture will pass through even this needle's eye. He says that the profession would—and the Court therefore should—look at the picture as a whole; that it would regard the main theme as the account of a motorboat torpedo squadron as a unit in the Philippines; that it would not suppose that every single trait of Lt. Kelly (as he then was) was accurately pictured in the character of Ryan; and that even a professional officer would come away with a sense of what a hero and what a credit to the Navy Lt. Kelly, alias Ryan, was.

■ I concur that it would be unsound to isolate each single episode, action and utterance of Ryan and ask whether an audience of professional Navy men would say that that single item was unbecoming an officer and gentleman. But I do not agree that an audience of professionals would say They Were Expendable was purely a picture of corporate accomplishment by a squadron and that the individuals had more or less fictitious attributes. I am of the view that like the general public, the officer group would identify Lieutenants Bulkeley and Kelly with the characters Brickley and Ryan. And I think they would go away from that showing of the movie with a clear picture of the difference in professional standards of the two naval officers represented by the two principal characters on the screen. They would conclude that each had a brave heart but that Lt. Bulkeley was a self-controlled responsible officer, but his executive officer had a temperamental streak which occasionally carried him just out of bounds. I am not led to a contrary conclusion by defendant's argument that letters from high naval officers showed approval of the picture. The fact that the picture was liked by a certain number of naval officers seems to me irrelevant—they were considering the picture as a whole and its treatment of the service

as an entity, not approving of the professional conduct of each character. Moreover, some of those naval officers were no doubt more mindful of the virtues of publicity for the Navy than of the rights of each separate individual to be fairly portrayed.

Indeed so far as I can tell, the difference in treatment of Lt. Bulkeley and plaintiff may be the real clue to why this action was brought. There were so many truthful elements in the picture of the two men that the average naval officer might suppose that the contrast in adherence to professional canons also tended to be true. Thus the representation was an example of the maxim, "the greater the truth, the greater the libel".

This explanation is indeed the only one that is consistent with the type of man Commander Kelly revealed himself to be not only on the PT boats in the Pacific but also in his attempts to avoid publicity by the Navy and in his behavior in the courtroom in Boston. Here he showed candor, modesty, courage, simplicity and presence of mind such as one rarely sees on the witness stand. Typical of Commander Kelly's composure under the stiff test of cross-examination by defendant's counsel, Mr. McClennen, is the following passage:

Mr. McClennen: "When you got back from the Philippines in the spring of 1942, you had been in some truly heroic exploits in the Philippines, had you not?"

Commander Kelly: "I presume that depends upon one's interpretation of heroic. It had been considered such by my superiors."

Mr. McClennen: "And you considered them such, didn't you?"

Commander Kelly: "I considered it line of duty." (R. 77). Or consider the dignity (apparent to everyone in the courtroom) with which Commander Kelly met Mr. McClennen's question on whether plaintiff recalled any act of his "indicating as much heroism, self-sacrifice and human concern at one time as is portrayed" in the motion picture. "I have never been accustomed to consider any of my acts as having been heroic." (R. 160).

11. But defendant says that even if the picture did hold plaintiff up to ridicule or otherwise defamed him, plaintiff gave defendant a license to show just that picture.

Plaintiff did, after repeated requests including one from the Secretary of the Navy, execute Ex. 4, the letter of December 21, 1942. I cannot find that as a matter of law he was coerced to execute the document. However, in view of the fact that it was drafted by others to serve the interests of others, and that plaintiff was a most reluctant signatory, I conclude that the instrument should be construed as favorably to plaintiff as possible. The opening sentences of the letter make it evident that what plaintiff was waiving was only his right to privacy in those states in which such a right was recognized. That is, he was giving a license which would prevent him from making the particular type of claim which Mr. Brandeis and Mr. Warren in their famous paper, The Right To Privacy, 4 Harv.L.Rev. 193, had proposed to have recognized and which was urged (unsuccessfully) before the New York Courts by a person who thought he was depicted in A Bell for Adano. Toscani v. Hersey, 271 App.Div. 445, 65 N.Y.S.2d 814. Plaintiff was not giving up any claim he might have on account of the common law of libel (such as is covered in Restatement, Torts, Bk. III, c. 24-27) not to mention the common law of intentional infliction of mental distress (such as is covered in the amendments proposed to Restatement, Torts, § 46). Thus plaintiff was not making a surrender, waiver or license adequate to excuse defendant from liability for the defamation alleged in the case at bar.

Moreover, in my view the provisions of the license limited defendant to depicting plaintiff or a character that corresponded to him. I find as a fact that in essential elements of professional fitness Rusty Ryan does not correspond to plaintiff. Therefore, one of the terms of the license was not met. I need not consider in detail whether defendant met other terms of the license (1) by securing approval of the United States Navy; (2) by not elaborating the romance beyond the portrayal of it in Mr. White's book; and (3) by portraying as accurately as possible historical events. It will be sufficient for me to say that I find a failure of defendant to meet the third and last of those terms.

12. There remains the final question as to what damages plaintiff may recover on account of the showing of the motion picture at the Boston theatres. There is no evidence that those showings lowered his reputation in the eyes of anyone who had the power to promote his naval career. And no actual injury to his career has been shown. Indeed, the award of decorations, the making permanent of his rank of Commander and the assignment (R. 84) to teach at Annapolis all suggest that plaintiff suffered no appreciable damage in his profession.

He testified that he did suffer social embarrassment in gatherings in Boston where there were guests who had actually seen or probably seen the movie. It is elementary that in Massachusetts as in most other jurisdictions plaintiff's mental anguish or suffering is an element of damage recoverable in a libel suit. Finger v. Pollack, 188 Mass. 208, 74 N.E. 317; Restatement, Torts, § 623; Magruder, Mental Disturbance in Torts, 49 Harv. L.Rev. 1033, 1055, 1056. But it has been said that "the injury to feelings which the law of defamation recognizes is not the suffering from the making of the charge, but is the suffering which is caused by other people's conduct towards him in consequence of it." Wigmore Evidence, Rev.Ed., 1940, vol. I, § 209; p. 704. If that were the law, then Commander Kelly could not recover because he has not shown that his injured feelings were the result of the conduct of persons in his profession who alone are the audience which I have found might have a lower opinion of him. But Professor Wigmore's statement does not state the law of Massachusetts. Marble v. Chapin, 132 Mass. 225; Curley v. Curtis Pub. Co., D.C.Mass., 48 F.Supp. 27. The most dramatic proof is Marble's case. Chapin falsely told Mary Cummings that "Mr. Marble has had intercourse with you". Miss Cummings knew it was not so; could

not have had her estimate of Mr. Marble lowered by the defamation; and never repeated the statement. Yet Mr. Marble was allowed to keep a verdict for his mental suffering. In short, in Massachusetts let there be a finding that defendant published a libel and it follows that the trier of fact can award plaintiff compensation for the injury to his feelings, dependent upon the trier's estimate of plaintiff's sensitivity. Curley v. Curtis Pub. Co., D.C.Mass., 48 F. Supp. 27.

And as the trier of fact I find that plaintiff while possessed of an exterior that is calm, cool and collected has an inner spirit of fineness and distinction. Such persons suffer more than readily appears to those who customarily measure by the gross proportions of the motion picture world.

There is only one factor which in any way suggests that plaintiff is not of the fiber that I have pictured; and not entitled to have his suffering measured on that basis. That was his admission that he had applied for and been granted the Purple Heart as a recognition of a wound which, while it may have been service-inflicted, was certainly not the result of unusual risks peculiar to war. Defendant's counsel hammered hard on this point, and I believe with some justification. But I am not persuaded that plaintiff lapsed more than momentarily from his customary attitude of depreciating all types of self-advertisement.

Doubt as to plaintiff's sensitivity cannot be premised on his willingness to bring this libel suit. To be sure, many men of dignity, particularly professional men, are accustomed to face with a stiff upper lip public minor misunderstanding of their work. But men of the finest grain may feel that when calumniators have circulated false and mischievous canards about their official accomplishments or private lives a libel suit is justifiable principally to secure judicial declarations of the truth rather than substantial monetary damages. [Compare Theodore Roosevelt v. Newett, reported in H. P. Pringle, Theodore Roosevelt. A Biography (1931), pp. 573, 574]. Moreover, a man of the highest character and sensitivity may on the advice of counsel come into court and ask a large recovery for libel on the ground among others that that is the best way to attract public attention as prominently to plaintiff's ultimate vindication as public attention was orginally attracted to defendant's misrepresentation.

Since the only elements of damage proved relate to (1) loss of reputation among naval officers who attended performances in two Boston theatres and to (2) mental disturbance, the recovery cannot be of large proportions. Commander Kelly may, however, take some justified pride in a judicial finding that despite quite as gruelling a cross-examination as any witness is apt to face in court he stands out as a man of exemplary physical and mental courage, of self-restraint and self-discipline, remarkably indifferent to self-advertisement but understandably disturbed by widespread depiction of him as deserting the ideals of his profession and adopting the patterns of culture favored by the movie-going public. At the request of the Secretary of the Navy, Commander Kelly, agreed to sacrifice for the nation's good his privacy, as he would have sacrificed his life. But he was never asked to and never agreed to sacrifice his reputation as a "chevalier sans peur et sans reproche".

On the first count, judgment for defendant without costs.

On the second and third counts, judgment for plaintiff for $3,000 with costs.