JOSEPH W. ROBERTS et al., Appellants, *v.* MURNIE FULMER et al., Respondents.

Argued April 10, 1950; decided July 11, 1950.

*George Kohn* for appellants. I. The trial court's finding of the existence of an oral contract of sale between the parties and that the agreement had been wrongfully breached by defendants is fully sustained by the credible evidence. II. The acts of part performance by plaintiffs are unequivocal in character and are solely referable to the oral contract, and specific performance was properly decreed by the Official Referee. (*Selzer* v. *Baker,* 295 N. Y. 145; *Metropolitan Life Ins. Co.* v. *Childs Co.,* 230 N. Y. 285; *Wendell* v. *Van Rensselaer,* 1 Johns. Ch. 343; *Levinson* v. *Myers,* 100 Misc. 379; *Walter* v. *Hoffman,* 267 N. Y. 365;

*Neverman* v. *Neverman,* 254 N. Y. 496; *Burns* v. *McCormick,* 233 N. Y. 230; *Woolley* v. *Stewart,* 222 N. Y. 347; *McKinley* v. *Hessen,* 202 N. Y. 24; *Canda* v. *Totton,* 157 N. Y. 281; *Young* v. *Overbaugh,* 145 N. Y. 158; *Wheeler* v. *Reynolds,* 66 N. Y. 227.) III. The agreement is definite and certain, and specific performance was properly decreed. (*Dunckel* v. *Dunckel,* 141 N. Y. 427; *Outlet Embroidery Co.* v. *Derwent Mills, Ltd.,* 254 N. Y. 179; *Stern* v. *Premier Shirt Corp.,* 260 N. Y. 201; *Cohen & Sons* v. *Lurie Woolen Co.,* 232 N. Y. 112.)

*Joe Schapiro* for respondents. I. The oral agreement sought to be proved by plaintiffs was entire and since part thereof was vague and unenforcible, the entire agreement is unenforcible. (*George* v. *Dobson,* 261 App. Div. 447; *De Beerski* v. *Paige,* 36 N. Y. 537; *Dunckel* v. *Dunckel,* 141 N. Y. 427; *Crouse* v. *Frothingham,* 97 N. Y. 105; *Warrin* v. *Charm Fashions, Inc.,* 193 Misc. 229; *Watts* v. *Carter & Sons,* 207 App. Div. 656; *Varney* v. *Ditmars,* 217 N. Y. 223; *United Press* v. *New York Press Co.,* 164 N. Y. 406; *Eisenberg* v. *Spachmann,* 117 Misc. 109.) II. Plaintiffs failed to establish that any agreement for the sale of the premises had been made. III. The Statute of Frauds bars the action, for the part performance testified to by plaintiffs is not '' unequivocally '' referable to an alleged agreement. (*Burns* v. *McCormick,* 233 N. Y. 230; *Neverman* v. *Neverman,* 254 N. Y. 496; *Rosen* v. *250 W. 50 St. Corp.,* 296 N. Y. 567.)

DYE, J. This action was brought to enforce specific performance of an oral contract for the purchase and sale of a farm and dairy upon the theory that part performance had removed the transaction from the Statute of Frauds (Real Property Law, §§ 259, 270), the plaintiffs alleging that, in reliance upon the oral agreement, they had gone into possession of the farm premises and thereafter had made extensive and costly improvements and repairs to the house, barns and fencing of substantial benefit to the real estate. The defendants, on the other hand, sharply controverted the existence of any agreement, oral or otherwise, for the purchase or sale of the premises; or, if such there was, claimed the alleged part performance was not unequivocally referable thereto and therefore the bar of the statute attached; and, finally, contended that the relationship, if any, was that of landlord and tenant rather than purchaser and seller.

The matter was referred to the late WILLIAM F. DOWLING as Official Referee to hear and determine. He found, in the conflicting testimony, satisfactory proof that an oral contract had been substantially performed. Judgment followed in favor of the plaintiffs. The Appellate Division has reversed the Referee's findings of fact and conclusions of law upon the view that the record disclosed a landlord-tenant relation rather than that of seller and purchaser; that the part performance was susceptible to explanation without reference to the alleged oral agreement under the authority of *Woolley* v. *Stewart* (222 N. Y. 347), *Burns* v. *McCormick* (233 N. Y. 230), and *Neverman* v. *Neverman* (254 N. Y. 496). These cases enunciate the general rule applicable in this State — note section 270 of the Real Property Law — to the doctrine of part performance as an exception to the Statute of Frauds. Neither the parties nor the courts below differ in their respective statements of this rule: the controversy here is limited to its application to the facts of this case. The Appellate Division having reversed upon the facts as well as the law and made new findings, we are obliged to determine which set of findings are supported by the weight of the credible evidence (Civ. Prac. Act, § 605; *Chamberlain* v. *Feldman,* 300 N. Y. 135; *Pocket Books, Inc.,* v. *Meyers,* 292 N. Y. 58).

Joseph Roberts and Murnie Fulmer — the principal parties to this litigation — had been closely associated since Roberts, at the age of seventeen, went to work in 1934 for defendant Fulmer, a well-established farmer and land trader. He worked steadily as a farm hand until 1935 and thereafter intermittently until 1937. From then until 1941 he drove a truck for the defendant. In 1937, he married the coplaintiff, a neighborhood girl well known to the Fulmers and whom they regarded as a "good milker." For four years following their marriage, the plaintiffs worked the "Yerdon farm" for the defendant until it. was sold. Roberts then secured employment with the General Cable Company in nearby Rome, N. Y., where Fulmer was also employed at the time and the two made the daily trip to and from work in Fulmer's automobile. Throughout their relationship was friendly and unrestrained and, although perhaps not confidential in the legal sense, was one which would normally be expected to result in trust and confidence and would, as is generally the case, lead an inexperienced youth to rely naturally

upon the statements of the older man who had been his friend and employer for upwards of twelve years.

There came a time early in the spring of 1946, according to Roberts, when Fulmer told him about the "Charney farm" which he owned, consisting of about 250 acres situated in Steubenville, Oneida County. He described it as a good place to bring up a family that he himself no longer wanted but if Roberts would take it he would " give me the biggest break I ever had ". Briefly stated, he offered to sell Roberts the farm for $2,500 payable in installments on one third of the milk checks, the deed to follow when the purchase price was fully paid. Roberts was interested. After talking it over with his wife and in the latter part of March, he, together with his wife and Fulmer, visited the farm and inspected the land and buildings. On this occasion Fulmer made a more definite proposition stating, according to Roberts, that " he would put a dairy of cows there of twenty-five cows and a bull, and that I could have the place for $2,500.00, and he would take a third of the checks until the place and the cows were paid for." Roberts and his wife — who fully corroborated her husband as to the details — accepted the offer and shortly thereafter, on or about the first of April, Roberts, as the Referee found, " in reliance upon the terms of the oral contract and in performance of the same " gave up his $80 per week war job in Rome and moved with his wife and five small children to the farm.

Fulmer flatly denied any conversation relating to purchase and sale. His version of the deal was that Roberts did not like working at the Cable Company and wanted to return to farming and that he finally agreed to let him on the Charney farm under an arrangement whereby Roberts would be compensated out of the milk checks on a one-third/two-thirds basis as a tenant on a share-crop basis. If there was nothing more to this record than the mere circumstance of occupancy of the premises, we could easily agree that the plaintiffs had failed to prove the oral contract. Such is not the case, however, as there is much testimony relating many acts which, we feel, are unequivocally referable to a claim of equitable ownership in the Roberts.

The farm concededly was in a rundown and unproductive condition having been fallow for over two years. The fields were overgrown and the fences down. The buildings, including a

dwelling, barns and outbuildings, were dilapidated and in need of attention. To make the house habitable, the plaintiffs, largely with their own hands, repaired the roof and chimney, plastered the inside walls, installed electric wiring and some plumbing and put cupboards in the kitchen. A foundation wall under the dairy barn was renewed, the milkhouse renovated and the fences repaired. It was estimated that the final cost of the materials for these repairs and improvements came to about $1,500. It is not disputed that as the farm became productive, Fulmer received one third of the milk checks which amounted in all to $2,428.78 — within $72 of the alleged price — at the time the present cause arose.

Defendant Fulmer, while conceding that the buildings and fences needed repairs, denied that the plaintiffs had done the work and furnished the materials as claimed. On the contrary, he asserted that he had paid for the materials as well as the wages of a man who helped Roberts with the work and had supplied some tools and equipment and, on occasion, had furnished fodder for the cattle over and above the one-third/two-thirds division of costs as agreed. In addition — a point undenied by Roberts — he had taken care of the taxes and insurance. Fulmer also showed that there had been a continual turnover in the dairy: cows died, or were sold or exchanged and new ones added until, at one time, there were as many as thirty-five head in the herd. In the latter part of December, 1947, he was informed that the cows were being neglected and he therefore — but without notice to the plaintiffs and during Roberts' absence — moved all the cattle to another farm which he owned and then served notice on the plaintiffs to vacate. Summary proceedings to repossess the farm followed on February 27, 1948, which were stayed when Roberts brought this suit.

It was brought out that Fulmer had owned the Charney farm since 1914; that he first sold it to one Wickman from whom he shortly repossessed it; that he again sold it to Charney in 1943 for $3,500 who, after paying about $1,400 on the price, defaulted and, for a consideration and in avoidance of foreclosure, reconveyed to Fulmer. On cross-examination, Fulmer proved difficult. He was often evasive and hedging in his attitude and his memory was vague in respect to many details. Likewise, the weight and credibility of the corroborative testimony given by

his wife — who, allegedly, kept the Fulmer accounts — was considerably shaken by her inability to produce adequate records relating to many of the transactions concerning the exchange and replacement of the cattle, her explanation being that she only kept such records as were necessary. Those she produced were incomplete and unsatisfactory to support her claims. She too was vague, uncertain and indefinite.

Again, however, if the issues here were limited to the sharply disputed factual details just mentioned, it could acceptably be argued that the acts and conduct of the plaintiffs upon the premises were as referable to a relationship of landlord and tenant or employer and employee as to that of seller and purchaser. Such acts, however, do not stand alone but appear in a new and clarifying light when we add the undisputed fact that Roberts, long after he had taken possession, entered into a written contract with the Northern Improvement Company for the residing of the farmhouse with a composition shingle at a cost to him alone of $800 payable in thirty-six monthly installments. It is likewise undisputed that this work was undertaken and that Roberts duly made the first five payments. This, on the face of it, was a substantial commitment for one in the plaintiffs' circumstances, involving, as it did, an obligation approximating one third of the purchase price of the farm and of unquestioned benefit to the fee. This placed Fulmer in a position to reap a considerable advantage if he was, in fact, still the owner. When inquiry as to Roberts' status was made of him by the company discounting the contract, Fulmer made a somewhat equivocal reply as to ownership, saying that he would never pay for any shingles. Later when he saw the work in progress, he merely expressed a disinterested view that it was a nice job without either protest or objection to Roberts. This episode — under the circumstances of these parties — appears consistent only with Roberts' ultimate ownership under an expectation of legal title when the purchase price was paid. The incident thus goes far to lend substance and meaning to the other acts of the parties. When viewed against the whole record, then, we hold that the acts and conduct of the plaintiff constituted part performance " solely and unequivocally referable " to the contract within our established rule (*Woolley* v. *Stewart, supra; Burns* v. *McCormick, supra,* p. 234; *Neverman* v. *Neverman, supra;* Real

Property Law, § 270). The Referee's determination, therefore, is supported by the weight of the credible evidence and should prevail. Throughout there were sharp issues of credibility which were, of course, primarily for the trial court (*Boyd* v. *Boyd,* 252 N. Y. 422; *Smith* v. *Smith,* 273 N. Y. 380) whose findings are entitled to great weight (*Amend* v. *Hurley,* 293 N. Y. 587).

Incidentally, there is no claim that the contract price of $2,500 covered anything more than the land and appurtenances. This, the Referee found, was separate from the cost of the dairy which was to be computed when a herd acceptable to Roberts was finally assembled, added to the total figure and paid for by a continuing division of the milk checks. The Referee appropriately put the parties to an election as to this latter item which, without further comment, we regard as a reasonable and equitable disposition.

The judgment of the Appellate Division should be reversed and that of Special Term affirmed, with costs in this court and in the Appellate Division.

FULD, J. (dissenting.) I start with the premise — for we are all agreed on the proposition — that not every act of part performance is sufficient to take an oral contract for the sale of real property out of the statute of frauds (Real Property Law, § 259). If equity is to enforce such an oral agreement, it requires assurance, positive and unequivocal, from the acts performed, that " The peril of perjury. and error * * * latent in the spoken promise " is avoided. (*Burns* v. *McCormick,* 233 N. Y. 230, 234.) Accordingly, the principle is firmly established that part performance " must itself supply the key to what is promised. It is not enough that what is promised may give significance to what is done." (*Burns* v. *McCormick, supra,* 233 N. Y., at p. 232.) In other words, part performance, alone and without relation to the oral promise, must be " solely and unequivocally referable " to an agreement of purchase and sale, " unintelligible or at least extraordinary unless as an incident of ownership "; if it is not, the promise may not be enforced. (See *Neverman* v. *Neverman,* 254 N. Y. 496, 500; *Burns* v. *McCormick, supra,* 233 N. Y. 230, 232, 234–235; *Woolley* v. *Stewart,* 222 N. Y. 347, 351.)

I fail to find in the record before us evidence of such part. performance. The plaintiff Roberts gave up a factory job paying $80 a week and, with his wife and children, moved to the farm; he then proceeded to make extensive repairs, to cultivate the land, to attend to and milk the cows, and to pay Mr. Fulmer, one third of the proceeds realized from the milk sales. While it may be argued that those were the acts of an owner or a vendee in possession, it may not be said that only an owner or a vendee would perform them. In no sense may it be asserted that such performance was " solely and unequivocally referable " to a contract of sale. It did not in and of itself supply the key to what was promised; it was just as reasonably referable to an agreement to rent as to one to sell.

Further appraisal of the proof relied upon but confirms that conclusion. Manifestly, the fact that Roberts gave up an $80 a week job and took possession of the farm cannot establish, without the aid of the words of promise asserted, that he occupied it as a purchaser rather than as a tenant — particularly since it appeared that Roberts had not been able to make ends meet in the city, detested factory work and preferred life on a farm. Nor does the fact that Fulmer and Roberts arranged that the proceeds from the sale of the milk should be divided on the basis of one-third to the former and two-thirds to the latter establish, without reference to the oral agreement alleged, a contract of sale. Fulmer's receipt of one third of the milk checks may conceivably have been on account of a purchase price, but, on the other hand, it may just as reasonably have constituted compensation to defendants as landlords for the use of their land and their stock — particularly since the entire herd of about twenty cows, which produced the milk, belonged to Fulmer, having been purchased by him and placed upon the farm for plaintiffs' use. Nor does the fact that plaintiffs made repairs and improvements point unerringly and without question to an agreement of sale. An owner or a vendee in possession would, of course, have done what Roberts did, but so would a tenant farmer — particularly when his sustenance and the amount of his earnings depended upon the state and condition of the farm and its buildings. In point of fact, in evaluating the significance of plaintiffs' acts, we cannot dismiss from mind or overlook that Fulmer not only had one of his own

employees assist plaintiffs in the work of repair and improvement; not only reimbursed plaintiffs for many of their outlays; not only shared the cost of feed and hay; but also actually paid the taxes on the property as well as the insurance and — in addition to supplying all of the cows — purchased equipment, such as a tractor and a milk cooler, for plaintiffs' exclusive use.

Whether or not the record convincingly stamps defendants as owners and landlords, whether or not the evidence persuasively marks plaintiffs as tenants, we need not decide. It is sufficient to say that the acts of part performance failed to point " solely and unequivocally " to a contract for the sale of the farm or to a vendor-vendee relationship; they were equally and as reasonably explainable as the acts of a tenant farmer receiving the major share of the milk checks for labors performed and expenses incurred.

I would affirm the judgment of the Appellate Division.

LEWIS, CONWAY and FROESSEL, JJ., concur with DYE, J.; FULD, J., dissents in opinion in which LOUGHRAN, Ch. J., and DESMOND, J., concur.

Judgment accordingly.   [See 301 N. Y. 778.]