Burke, J. (dissenting).
Plaintiffs appeal from an order of the Appellate Division reversing an order of Special Term and dismissing the complaint for failure to state a cause of action and vacating an injunction pendente lite granted by Special Term. The complaint was dismissed on a motion directed to the face of the complaint.[1]
The complaint sets forth two causes of action. The first alleges (i) illegal misappropriation and commercial exploitation for defendants’ private profit the name, symbols, football team, high prestige, reputation and good will of the University *942 of Notre Dame with consequent dilution of their high value[2] in both the book and film “ John Goldfarb, Please Come Home ” and (ii) irublic confusion and deception in believing that Notre Dame is connected with the motion picture and the book. The second cause of action alleges the use of the president’s name and identity by defendants, for purposes of trade and without his consent, in violation of his rights under sections 50 and 51 of the Civil Eights Law.
The dismissal of the first cause of action for commercial exploitation rests on two grounds. First, the Appellate Division has concluded on a motion to dismiss that plaintiff has no basis for showing any possible inference of “ connection or benefit to the institution”,[3] citing Cornell Univ. v. Messing Bakeries (285 App. Div. 490, 492, affd. 309 N. Y. 722). Secondly, it has decided without citing a precedent that, putting aside the First Amendment issue, the doctrine of ‘ ‘ unfair competition” is not applicable because “the work is a form of expression” “‘a form of social and literary criticism’”. *943 The Appellate Division concedes that section 397 of the General Business Law (added by L. 1961, ch. 438) prohibits the use of the university’s name for advertising purposes or for purposes of trade but takes the view that a “ situation like the present was remote from the Legislature’s contemplation
The second cause of action brought under section 51 of the Civil Rights Law is dismissed on the ground that, although the publisher conceded that the use of Father Hesburgh’s name in the book is an essential ‘ ‘ character ’ ’, it is, in the opinion of the Appellate Division, a nonactionable ‘ ‘ incidental ’ ’ use and the use and representation of the same identity of character in the motion picture is either “incidental” or not a “use of the name ”.[4]
The Appellate Division’s decision is wrong on all points: (1) it ignores the elementary rule of law governing motions directed to the face of the complaint; (2) it misreads the decision of this court in the Cornell case (supra); (3) it eschews the record and the facts in the record when it concludes no one would believe there was a connection with the university and in finding a problem of “ freedom of expression ”; (4) contrary to precedent it limits the scope of sections 50 and 51 of the Civil Rights Law, and (5) it misconstrues section 697 of the General Business Law by creating an exemption when the Legislature expressly refused to allow any exemptions.
On the motion to dismiss the first cause of action, the defendant Fox stated it was not necessary to view the picture as they were moving on the face of the complaint. This, of course, was correct as all the allegations set forth in the complaint and their interpretation of the exhibits attached thereto must be deemed to have been proven when such a motion is considered. “We are required to assume the truth of plaintiff’s *944 allegations of fact; ‘ every intendment and fair inference is in favor of the pleading ’ and if ‘ in any aspect upon the facts stated the plaintiff is entitled to a recovery, the motion should be denied. ’ (Dyer v. Broadway Central Bank, 252 N. Y. 430, 432-433).” (Sutton v. Hearst Corp., 277 App. Div. 155, 156.) Since the plaintiff Notre Dame, a university possessing a commercial property right well known to movie goers (n. 2, supra), is alleging that there is a dilution of the value of this property right brought about by the unauthorized use of its symbols, the Appellate Division Justices could not shut off their inquiry in such summary fashion.
To us it is obvious that, because defendants have admittedly taken the name and symbols of Notre Dame and of its football team repeatedly throughout their productions, readers and viewers are likely to think Notre Dame was connected with the enterprise and that Notre Dame would be irreparably harmed thereby. Certainly, with the script calling for actual film clips of an actual Notre Dame team in action, the remarks in Sports Illustrated, and the admission of the producer (n. 2, supra), the question of whether rational readers or viewers could draw such an inference would be at least a triable issue. Indeed, considering the facts in Cornell Univ. v. Messing Bakeries (supra), the court in this case would be justified in issuing a permanent injunction, since a stronger reason for granting relief is presented here. In the Cornell case, the university agreed that the defendant could use the phrase “ Cornell Formula Bread ” but no pennant, flag or other symbol indicative of a college. Defendant used the phrase “ Cornell Becipe Bread”, eliminated the pennant and substituted a scroll. The university sued to enjoin the use of its name and the scroll, plus other relief not pertinent here. Special Term found that the university never granted permission to appropriate and use its name' on and in connection with advertising material and that the defendant’s appropriation and use of the name “ Cornell ” was calculated to, and did in fact, deceive, mislead and confuse the public into believing that the university was associated with the defendant. The judgment at Special Term allowed the use of the phrase “ Cornell Formula Bread ” but provided that no pennant, scroll, banner or similar device could be used. The Appellate Division modified to allow the use of the phrase “ Cornell Becipe Bread ” and reversed the *945 findings of fact set forth above. In lieu of the two reversed findings the Appellate Division made a new finding of fact as follows: “ Plaintiff promptly protested the use by the defendant of the name [1] Cornell ’ and other marketing and advertising material; but on or about May 16, 1952, the plaintiff issued a memorandum of that date covering the use by the public of a bread formula and prescribing the terms and conditions under which the formula could be attributed to the plaintiff and the name ‘ Cornell ’ used in the promotion and sale of the bread; and the defendant’s use of the name * 'Cornell Recipe Bread ’ at the time of the commencement of this action complied substantially with the terms and conditions of such memorandum, except that defendant used a scroll as background for the name ‘ Cornell, ’ and such use of a scroll was contrary to such memorandum and objectionable as indicative of the plaintiff university. ’ ’
When the Appellate Division reverses specific findings of fact and makes new findings, as it did in the Cornell case, it becomes the duty of this court to determine which findings are supported by credible evidence. (Roberts v. Fulmer, 301 N. Y. 277, 281.) In this court we recognized that the university had a property right in its name, but obviously had relinquished a part of this right. Although the university had allowed the use of its name on a product sold to the public, we decided, it could nevertheless impose conditions on that use. These conditions, we believed, should be strictly enforced for it is only by promising such adherence that the defendant obtained the right to use the name. Therefore, the Cornell case was not a palming off case. It is clear beyond any doubt that the court below erred in characterizing it as such. Again we must point out factors in Cornell which the Appellate Division here overlooked. In Cornell the trial court found that the appropriation of the Cornell name was calculated to and did deceive, mislead and confuse the public into believing that the university was associated with the defendant bakery. When the Appellate Division reversed this finding of palming off and deception, there was no difficulty in deciding the single issue that remained, viz., that the use of the symbols of a college or university, were objectional as indicative of the plaintiff university and that such use should be enjoined.
*946 While some would interpret Cornell as requiring a showing of public confusion as to the university’s participation in the trade or commerce involved, the true basis of that decision rests upon defendant’s failure to follow the strict terms contained in the memorandum granting defendant a restricted use; liability attached merely because defendant used a scroll with the name ‘ ‘ Cornell ’ ’ rather than the approved mention of the name. In short, Cornell recognizes that an educational institute has an absolute property right in its name and symbols which it may license or withhold under any conditions that it may see fit.
Thus, even in a case in which a university acted in derogation of the property right which it possessed and where questions of palming off or deceiving the public were not present, we found that the use of a scroll, pennants or flags constituted an infringement of the property rights possessed by the university, and also that such use was “ objectionable as indicative of the plaintiff university.”
The facts are stronger, of course, in the case át bar. One need not find some connecting link between the product on sale in the present case, that is, copies of the book or showings of the movie, and the institution, to establish its cause of action. The fact that the general public may have been aware that Cornell University had developed a special recipe for bread was not a sine qua non to the granting of injunctive relief in the Cornell case. Also, no special connection of this or any other sort is needed in the present case to realize that the “Notre Dame” of' the book and movie is the University of Notre Dame,, the Indiana institution that is the plaintiff in this case. The fact that the name of this institution was intentionally used in the script is deemed admitted on this motion to dismiss. If it was clear to this court that the use of the scroll, pennants and flags, etc., of a college in the Cornell case was “objectionable as indicative of the plaintiff university”, it should be equally clear that the use of the name, symbols, banners of the university and uniforms of the Notre Dame football team and the film clip of what purports to be an actual Notre Dame team was also “ objectionable as indicative of the plaintiff university ’ ’.
None of the 13 Judges who sat in the Cornell case had the slightest difficulty in concluding that Cornell was identified with the defendant’s enterprise because its symbols were used in *947 conjunction with pennants, banners and scrolls, and, further, that Cornell was entitled to injunctive relief against such an appropriation of its property rights without specific consent. Here the defendants’ use of the university’s name, etc., is without any consent. Surely the property rights of the University of Notre Dame should not be treated differently. We have held that the public might assume and believe that Cornell was interested in the defendant bakery enterprise ■ because the wrapper on bread carried a pennant, flag or scroll. Cornell was recognized as having a right to restrict the use of its name to .the extent it saw fit, no potential injury to the public being considered as necessary to the cause of action. In the light of this holding we can hardly be correct in affirming the dismissal of a complaint in a case where there has been no public dedication as in Cornell but on the contrary where it is public knowledge that whenever the Notre Dame name is used in a motion picture it is only with the full approval of the university granted under special license. Thus, in the present case, there is even more reason for readers and viewers to believe that Notre Dame had authorized the use of its name and symbols; there is even more dilution of the value of these property rights by their unauthorized commercial exploitation and danger of irreparable harm thereby.
The Appellate Division has failed to distinguish between cases granting equitable relief because there was a palming off or a deception of the public and those holding the plaintiff entitled to equitable relief simply because the use of his name or symbols might cause the public to believe plaintiff is allied with the defendant, or has licensed the use. The rule in the first group of cases is for the protection of the public and the plaintiff, the rule in the latter group prevents misrepresentation as well as an appropriation of a property right without consent. (Munro v. Tousey, 129 N. Y. 38 [1891]; Madison Sq. Garden Corp. v. Universal Pictures Co., 255 App. Div. 459, 467; Electrolux Corp. v. Val-Worth, Inc., 6 N Y 2d 556, 567-568.) The fact that none of the potential public injury and confusion that is indicative of a palming off case is present here is no reason for us not to apply the principles enunciated in the cases of this latter group.
The dismissal of the second cause of action without a trial on the ground that the use of Father Hesburgh’s name was “ mci *948 dental” is unsupportable. The allegations assert that he is specifically mentioned by name in the book and is identifiable as the character in the motion picture who carries out that same part. Accepting this allegation as true, as wc must on a motion to dismiss, the cause of action pleaded is good. (Hofstadter and Horowitz, The Right of Privacy [New York, 1964]; Kelly v. Loew’s Inc., 76 F. Supp. 473; Walcher v. Loew’s Inc., 129 F. Supp. 815; Bernstein v. National Broadcasting Co., 129 F. Supp. 817, 833.)
This court stated in Binns v. Vitagraph Co. (210 N. Y. 51) at page 57, “ A picture within the meaning of the statute is not. necessarily a photograph of the living person, but includes any representation of such person ’ ’. And as was held in Young v. Greneker Studios (175 Misc. 1027, 1028 [Supreme Ct., N. Y. County, 1941]), “The same observation is equally applicable to the word ‘ portrait ’ ” as used in the Civil Rights Law. This is particularly true, as to both “ name ” and “ picture ”, where, as here, (1) the same character is simultaneously and reciprocally promoted and appears in both book and photo-play, and (2) the advertising for both book and movie were financed in common. A reader and viewer would know that the character “ Father Ryan ” in the picture is the same character as “ Father Hesburgh ” in the book, and that both refer to Father Hesburgh, President of the University of Notre Dame. (See Hofstadter and Horowitz, The Right of Privacy [1964], § 5.3, pp. 37-40; Kelly v. Loew’s Inc., 76 F. Supp. 473, supra [D. Mass., 1948]; Walcher v. Loew’s Inc., supra [E. D. Mo., 1949].) In both book and picture there has been a use by defendants of the “ name ” and “ picture ” of Father Hesburgh. Undeniably, the use is “ for the purposes of trade ”. As stated in Hofstadter and Horowitz, The Right of Privacy ([1964], § 5.3, pp. 37-40): “The mere change of names in connection with an appropriation for trade purposes will not defeat recovery if the plaintiff is readily identifiable * * * Courts have uniformly allowed recovery in both libel and privacy actions if such identification exists regardless of the substitution of names.”
Toscani v. Hersey (271 App. Div. 445 [1946]) can hardly apply to these books and picture, where the plaintiff president is specifically identified in the hard-cover book and in the paperback edition which was published to coincide with the release *949 of the movie. Photographs from the picture were furnished to provide' front and back covers of the book. (See Hofstadter and Horowitz, The Right of Privacy, §§ 5.3, 5.4, 5.5, 5,6. pp. 37-44, where the Toscani case is noted as standing for no more than that a cause of action does not exist where there is a “ ‘ mere portrayal of acts and events concerning a person designated fictitiously in a novel or play merely because the actual experiences of the living person had been similar to the acts and events so narrated ’ ”.) “ (But if plaintiff is readily identifiable, liability may result, as already indicated).” (Id., § 5.6, pp. 43-44.)
Apart from the publisher’s concession that the use of the name was “ essential ”, the number of times it was used assumes no importance" in a civil rights case. In Blumenthal v. Picture Classics (235 App. Div. 570, affd. 261 N. Y. 504) the plaintiff was shown for six seconds in defendant’s motion picture while she was selling bread and rolls on the streets of New York. This court held that she had an absolute right to an injunction under the 'Civil Rights Law. In Flores v. Mosler Safe Co. (7 N Y 2d 276, 280-281) this court said: “ The purpose of the statute is remedial and rooted in popular resentment at the refusal of the courts to grant recognition to the newly expounded right of an individual to be immune from commercial exploitation (Lahiri v. Daily Mirror, 162 Misc. 776, 779). Justice Shieuítag, in his opinion in the Lahiri case, in establishing a guide in the construction of these sections has said that A statute of this kind is not “to be obeyed grudgingly, by construing it narrowly and treating it as though it did not exist for any purpose other than that embraced within the strict construction of its words.” It is “ not an alien intruder in the house of the common law, but a guest to be welcomed * * * as a new and powerful aid in the accomplishment of its appointed task of accommodating the law to social needs.” ’ (Lahiri v. Daily Mirror, supra, p. 779.) ”
The character ‘ ‘ Father Hesburgh ” is of such moment in this story that it occupies an entire chapter. As defendants Doubleday and Fawcett explain their “incidental” use of Father Hesburgh’s name and position, “ It was essential to the development of the plot that the Department of State be shown making the necessary request to an official of the University. ’ ’
The rule in Blumenthal (supra)-—a newsreel case—applies *950 equally to Father Hesburgh’s claim which is made in connection with the use in work-s of fiction. The New York Civil Liberties Union carefully pointed out that this aspect of the case is “ not within the present scope of the Union’s interest”. It should be if there is to ¡be equal treatment under law.
Not only does the complaint state a cause of action under the doctrine of unfair competition and section 51 of the Civil Rights Law, but also under section 397 of the General Business Law. Under the statute, worded as it is, questions of property rights, palming off, confusion or commercial value and the morality of the commercial use need not be considered. Use of institutional names is proscribed unqualifiedly “ for purposes of trade ”.
Since the memorandum submitted with the bill which ultimately became section 397 states that the ‘ ‘ precise statutory language ’ ’ of the Civil Rights Law ‘ ‘ has been incorporated in this bill so as to permit reference to the substantial body of decisional law”,[5] we may look to the decisional law under sections 50 and 51 of the Civil Rights Law for a definition of the term ‘ ‘ trade ’ ’. The test in every ease since Binns v. Vitagraph Co. (210 N. Y. 51, 55, supra [1913]) is whether the reference entails “-discussion” of public activities partaking of the public interest or mere exploitation of name, symbols and reputation for some commercial use.
Applying this test to the record before us, the conclusion is inescapable that this is exploitation rather than discussion. Not only does appellant allege exploitation in its complaint, and thus establish a valid cause of action that defeats the present motion, but, also, respondents by their numerous affidavits and memoranda (see ns. 6, 8) establish conclusively that no attempt was made to discuss or comment upon the real Notre Dame. *951 Respondents themselves state that the use of the symbols and name of Notre Dame was necessary because of the “practicalities ” of the situation and to make the works “ marketable ”. As Special Term found, “ [b]y their [respondents] own urgings,[6] and the court agrees upon a reading of the book and picture script, neither the book nor the motion picture is a satire, burlesque or any other form of literary portrayal or criticism of the University of Notre Dame or its team In the face of such a broad disclaimer by the respondents, it is difficult to comprehend how the Appellate Division could so summarily characterize the script and book as “ discussion ” and “ satire
By the enactment of section 397 of the General Business Law, the Legislature made the same cause of action upheld in the Cornell decision a statutory cause of action. Now the prohibition against the commercial use by another of the name, symbols and reputation of an educational institution is an absolute one. The Appellate Division was aware that the courts cannot create an exemption when the Legislature after studying the arguments pro and con over a period of two years refused to provide for an exemption. Yet that court excused the defendants in the *952 face of the numerous decisions covering the last half century[7] by reasoning that, because a book or motion picture is “no ordinary subject of commerce ”, they are exempt from not only the rules governing unfair competition but also the prohibition of the statute. The statute did not create or alter the law as to what is [1] ‘ trade ’ ’. It merely gave to educational institutions a cause of action for injury to its property rights and its name, symbols and reputation by their use for purposes of “ trade ”. It is argued that the defendants’ works are not “trade” because “ the work is a form of expression”. No prior decisions are cited and there are none. There' can be no question that defendants’ use of the university’s property rights was for purposes of trade — to render defendants’ products “ marketable ”.[8] The book was written from the original script which had incorporated the references to Notre Dame because of the “practicalities” to make the script “marketable ’ ’. Although the court below would avoid the First Amendment issue, the “ form of expression ” reasoning is a paraphrase of the First Amendment argument of respondents. This constitutional issue necessarily must be reached, as it is respondents only defense that raises a pure legal question.
In deciding that the causes of action are both appropriate and constitutional in this case we need go no farther than the facts of this case, and in this case the facts that we regard *953 clearly stand somewhat alone. Most significant in this regard are the unqualified admissions of the defendants’ officers and associates given in affidavit form (see ns. 2, 6, 8).
The tale that is told of the university is a tale which is true to the real institution in but one respect, that of identification— viz., Notre Dame is a present-day American university with a football team that is well known for being one of the best. Beyond that none of the acts of the institution in the story even come close, according to defendants, to what has been done or. would bo done by the real institution, and this is equally the case with regard to the acts of the institution’s football team, coach, officers, etc., as they stand in contrast on and off the screen. Thus it is that the story would not even hint of Notre Dame, the real life institution of higher learning that really exists in America today, had the name and the insignia of that institution not been “tacked on” to the school in the story.
The argument is made, and this appears to be the main thrust of the opinion in the Appellate Division, that if we enjoin the release of this film it would preclude authors from telling tales of an institution, corporation or public figure without their consent. This is the real evil that the constitutional protection for free expression is aimed at. It is urged that a permanent injunction in the present case would muzzle criticism of our public institutions by authors of fiction. The cry goes up that an injunction here spells out the end of the lampoon, the satire — the right of free criticism arid comment. But all these fears are unfounded since the facts of this case, revealed by the defendants and confirmed by the contents of the books and picture, do not serve as examples of opinion, information education or comment about a real institution. Bather, what is before this court is simply a fictional story with the name of a real institution affixed to it and the symbols used in it for the sake of capitalizing on the publicity value and reputation which the real institution has given those names and symbols.
There is no attempt here to satirize the University of Notre Dame. If the authors had desired this effect they could have achieved it, as much as they achieved their satire of the State Department and the CIA. The admissions of the defendants in their affidavits make it clear that there is no attempt in this picture to satirize Notre Dame, or even depict that institution. The defendants have urged that as a matter of State law the *954 usual rules of 'unfair competition, such as the rule in the Cornell case, ought not to be extended to the publication industry, which would include the motion picture industry. They say that to do so would place unreasonable limitations on the traditional institutions of comment, discussion, criticism, satire, ridicule, burlesque and lampoonery. In fact it is these very institutions, integral parts of free expression, which are protected by the Constitution. We do not contend that these forms of expression should be fettered by unreasonable prior restraint. In fact we do not think that we need concern ourselves here with the amount of protection which ought to be given these institutions, for with regard to this case none of them are present. On the record before us the presence of the name and symbols of the University of Notre Dame in the scenario is not the result of an attempt to make a satire of it, or even to comment on it (see n. 8).
As urged by the university the appropriation of their name and the insignia of the school by the defendants merely to dress up the screenplay and book, for the conceded purpose of making them ‘ ‘ marketable ”, is not a mere form of expression. The motivation was to tack on a valuablé and well-known label. The owner of such label has always been able to prevent others from appropriating it for profit as Cornell University was properly able to do in its suit. This is particularly so here, for defendants’ own description of the picture proves it is not a form of expression deserving special protections. We would be ready to give them to genuine form of expression, but here it is conceded by the defendants that all references to the university are not aimed at comment about this university, but are dictated by the ‘ ‘ practicalities ’ ’ of the situation and are profit oriented and necessary for “ marketability ”.
The Supreme Court has recently indicated that there is a restraint procedure that is acceptable. This is the New York injunctive procedure to prevent the sale of obscene books. (See Kingsley Books v. Brown, 354 U. S. 436, and Freedman v. Maryland, 380 U. S. 51.) That procedure postpones any restraint on sale until a judicial determination following notice and an adversary hearing. The procedure by which permanent injunctions are issued under the Civil Rights Law (§§ 50, 51) and the General Business Law (§ 397) is similar. The plaintiffs here are entitled to a permanent injunction after notice, a hearing, a judicial determination and appeals.
*955 Several Judges suggest that Father Hesburgh has a cause of action under the Civil Eights Law, but only one sounding in damages. The suggestion is no less than a demand that the court should decree a forced sale of Father Hesburgh’s right to privacy and determine a license fee to be paid for the use of his name for a purpose which he long ago rejected. A similar suggestion as to the university’s cause of action is equally untenable and unjustified.
Section 397 of the General Business Law and sections 50 and 51 of the Civil Eights Law mandate a permanent injunction in the circumstances presented here in favor of the plaintiffs.
Order affirmed, etc.

. In addition to the complaint there are exhibits consisting of (1) the revised final screenplay, John Goldfarb, which refers to introducing in the picture “Notre Dame films of the Johnny Lujack era” (the book was written from the original script); (2) the paperback book, “John Goldfarb, Please Come Home ”, which mentions plaintiff Hesburgh specifically and has scenes from the motion picture on the front and back covers; a copy of an issue of Sports Illustrated, the cover of which has a picture of a football player in a Notre Dame uniform gazing at Shirley MacLaine under a caption “ Shirley MaeLaine gallops 99 yards against Notre Dame ” and the publicity article in it on the movie refers to “22 Notre Dame football players”; (3) an affidavit of Columbia Pictures confirming a refusal of Notre Damp to allow references to Notre Dame in this screenplay.

. In 1931 Universal Pictures sought and was granted leave to film and distribute “ The Spirit of Notre Dame ” subject to technical advice. In 1939 Warner Brothers entered into a formal agreement in connection with the picture “Knute Roekne, All American”. In 1955 Columbia Pictures entered into a formal agreement with the university in which it agreed to pay a percentage of the gross receipts of any pictures using the university’s name which it produced. Other instances which prove that the name, symbols, football team and reputation of universities have commercial value, that they are sought for permitted use in motion pictures, on agreed terms including monetary payments, are “The Long Gray Line”, “The Spirit of West Point”, “Crazylegs” (Wisconsin and Michigan) and “ Harmon of Michigan ”, etc. The producer of the picture in the present ease states: “Notre Dame was chosen because of its long outstanding reputation * * * [without it] the whole plot and climax of the story would be rendered pointless and unmarketable.”

. At the climactic game in the film, the Notre Dame players, dressed in the green and gold uniforms of Notre Dame and helmets of Notre Dame painted with its green shamrocks, play skillfully and yield up the game only when the female lead, a reporter for “ Strife ” magazine, dons Fawzian football garb and enters the game, running the field for the winning touchdown when Notre Dame players abstain from ta.ckling her. The game is played with Notre Dame pennants, banners and symbols prominently displayed. At the banquet the night before, the players are dressed in Notre Dame blazers with Notre Dame insignia; and at a palace preview of motion pictures, prior to the Notre Dame team’s arrival in Fawzia, to show the competition Fawz U. may expect from Notre Dame allegedly actual game films of a real Notre Dame team in action are shown.

. The book “John Goldfarb” contains separate passages referring to a “ character ” specifically identified by name as “ Father Hesburgh ” and “ the Reverend Father Theodore Hesburgh”, president of Notre Dame. In the motion picture the character “Father Ryan” depicted in the motion picture is the same character, playing the same part, as “ Father Hesburgh ” and “ the Reverend Father Theodore Hesburgh” in the book (Script, T-l pp. 94-95 and 105-106). This is so, of course, because the paperback edition has been published to coincide with the release of the movie and has been joined with it in mutual promotion. In these circumstances, the use of the appellation “Father Ryan” in the movie is a mere transparent device as the change of name cannot mask the character’s true identity because of the use of the real name in the companion book.

. Redmond v. Columbia Pictures, 277 N. Y. 707; Franklin v. Columbia Pictures Corp., 246 App. Div. 35, affd. 271 N. Y. 554; Blumenthal v. Picture Classics, 235 App. Div. 570, affd. 261 N. Y. 504; Binns v. Vitagraph Co., supra, motion pictures; Lahiri v. Daily Mirror, 162 Misc. 776; Sutton v. Hearst Corp., 277 App. Div. 155, newspapers; Durgom v. Columbia Broadcasting System, 29 Misc 2d 394, television production; 1961 Memorandum of Metropolitan Opera Association; 1961 Report of the Association of the Bar of the City of New York, Committee on State Legislation; Letter from Lauterstein and Lauterstein to Executive Chambers, March 31, 1961.

. Doubleday and Fawcett state that the satire of the book and picture are “ directed not at Notre Dame” and “in no way related to Notre Dame.” The respondent Fox’ affidavits state: “ there is nothing in this motion picture which properly could be regarded as offensive to the ideals, good name, reputation or academic standing or excellence of Notre Dame, or which in any way casts Notre Dame’s outstanding football team in any unfavorable light.” “It is clear from the picture and from the screenplay on which it is based that neither Notre Dame nor any of the members of its football team is depicted as engaging in any conduct which might be considered offensive, immoral or not in keeping with the highest standards to which Notre Dame has always aspired and over the years has achieved.” “ The story, in its proper focus, is a free-swinging satire on world affairs, United States foreign policy and policymakers, the pitfalls and problems inherent in oil diplomacy and our dealings with certain Arab nations. In fact, the section with Notre Dame and the Shiek is a sub-plot and certainly not the theme of the film”. “But even dealing with this sub-plot, it is incredible that anyone could possibly assume that there is a single grain of reality in the wild goings on.” “They play an ‘honorable’ game all the way despite this.” “At worst the picture displays Notre Dame’s football team losing a football contest because only all sorts of ‘skulduggery’ was practiced upon them.” “We challenge anyone to point to a single word in the book which attacks or even pokes fun at Father Hesburgh, the academic staff or the prestige of the University.” (Doubleday and Fawcett.)

. Madison Sq. Garden Corp. v. Universal Pictures Co., 255 App. Div. 459; Blumenthal v. Picture Classics, 235 App. Div. 570, affd. 261 N. Y. 504; Binns v. Vitagraph Co., 210 N. Y. 51, 55; Redmond v. Columbia Pictures Corp., 277 N. Y. 707; Franklin v. Columbia Corp., 246 App. Div. 35, affd. 271 N. Y. 554; Kirk Douglas v. Disney (unreported) (Cal. Super. Ct., L. A. County); Mack Sennett v. Prosser (No. 541049 unreported); Patten v. Superior Talking Pictures, 8 F. Supp. 196; Ettore v. Philco Television Broadcasting Corp., 229 F. 2d 481, and Walcher v. Loew’s Inc., 129 F. Supp. 815, all motion picture cases. Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 799, affd. 279 App. Div. 632, recordings. Spahn v. Messner, Inc., 43 Misc 2d 219, 225-226; Sutton v. Hearst Corp., 277 App. Div. 155 and Hogan v. Barnes & Co., 114 U. S. P. Q. 314, published works; Durgom v. Columbia Broadcasting System, 29 Misc 2d 394, television production.

. In his affidavit in support of the defendant-respondents’ motion to dismiss, Mr. Steve Parker, the film’s producer, made the candid statement: “ This farce * * * would suffer from the elimination of Notre Dame to the extent that the whole plot and climax of the story would be rendered pointless and unmarketable.” This is not the language of a commentator, it is the language of a tradesman.