Bergan, J. (dissenting).
After a full trial on the merits at which the Justice at Special Term heard the witnesses and had full opportunity to assess their credibility, it was found that under an arrangement mutually advantageous to the parties, defendants orally agreed to convey a portion of land they owned to plaintiff after he had paid off a mortgage. Since this fact-finding was unanimously affirmed by the Appellate Division, the facts and their evaluation are not open to revision here on appeal.
Nevertheless, a majority of this court seems to be reversing the Appellate Division and the Special Term because it feels *136 the “ performance ” of the agreement was not “ unequivocally referable ” to the contract which has been established. A similar term was first used by Collin, J., in Woolley v. Stewart (222 N. Y. 347, 351) and later adapted by Cardozo, J., in Burns v. McCormick (233 N. Y. 230, 232).
The old problem in equity is when to decide that justice and fairness require a party to be relieved of the statute’s operation. Equity customarily addressed itself to the justice of the case according to how the facts were found to exist. But the facts themselves were left to be discovered according to the usual method of trial. This present case presents unusually good reasons, grounded in the practice in equity, why plaintiff should be relieved of the need to produce a writing.
There is no doubt that the proof meets all the court’s earlier legal tests, especially the requirement of Woolley (222 N. Y. 347, 351, supra), in the language of Judge Collin, that the acts of performance must be ‘ ‘ unequivocal ’ ’ in their character and have reference to the carrying out of the agreement, or as Judge Cardozo paraphrased this in Burns, be ‘ ‘ unequivocally referable ” to the performance.
Terms like ‘ ‘ unequivocally referable ” in a judicial opinion are not isolated literary islands. What the words mean, and hence their value as precedents, must depend on their exact relation to what the court was deciding with the problem before it. The acts of “ performance ” by the plaintiffs in Burns of the agreement to convey not only were not unequivocally referable to an agreement to convey; but objectively seen they were not referable at all to an agreement by the decedent to convey and any relationship with a transfer of title depended entirely on the plaintiffs’ testimony of how the acts were to be interpreted. Plaintiffs simply moved in with the aged owner of the land and lived with him for five months until he died, claiming an oral agreement to make a conveyance to them. They did nothing whatever, nor did the decedent, that had any reference to the title to the real property.
The facts of that case thus bear no analogy to the facts of this present case. Although tenants sometimes pay taxes on real estate they rent, it would be a rather rare thing for an occupant of land as a mere tenant to pay off almost the entire balance of a mortgage which represented most of the investment *137 in real property as well as paying the taxes and making substantial improvements. This is a far cry from anything remotely similar to the Burns problem.
And thus the finding of the Special Term that plaintiff’s occupancy was in pursuance of an agreement to receive title does not rest on proof which the trial court as a matter of law was compelled to regard as “ equivocal ” proof but, taken with the relationship of the parties to the farm in question, the undoubted advantage to defendants of the arrangement strongly supports the factual conclusion reached at Special Term and affirmed at the Appellate Division.
In attempting to reach an equitable resolution of the rights involved in this intramural family dispute, it is useful to see the relationships of the parties. For almost a century this farm had been in the Wilson family. The plaintiff, William A. Wilson, the defendant, Hazel B. La Van, and Harold Wilson, now deceased, were the children of Charles A. Wilson, who in his lifetime had owned the farm. At the time of his death there were mortgages of $7,000 and $3,600 on the property.
In the depression in the early 1930 ’s and after the death of Charles, the farm, like many others, ran into financial difficulties. On June 30, 1934, defendant Bobert La Van took an assignment of the second mortgage for which he paid $300. This apparently was an intra-family arrangement. La Van, who is not a farmer but a postal employee, explained he was then the only one who had any money. In a foreclosure of the second mortgage La Van then took title to the property subject to the first mortgage. He paid about $1,000 as foreclosure expenses.
The only other money he ever paid for the acquisition of the land was $900 on the first mortgage between October, 1938 and January, 1940, long before the agreement with plaintiff. His total investment in the property was thus about $2,200.
The arrangement found by the court was that plaintiff and defendants agreed in 1947 that plaintiff was to work the farm; to pay off the balance of the first mortgage; to pay all the taxes ; maintain the physical upkeep of the farm; that defendants were to occupy the main residence and garage without payment of any taxes, and that when plaintiff had paid off all the mortgage he would receive a deed for a portion of the property (the farm *138 part), excluding the lot occupied by defendants and their main house and garage.
It has been found that in pursuance of this agreement plaintiff paid toward taxes, the maintenance of the land, and the extinguishment of the mortgage debt, some $22,157, of which $7,685 was taxes; $6,576 for mortgage reduction and interest; and $7,895 for farm repairs, upkeep and new improvements.
Against this total investment of $22,157 by plaintiff, defendants establish only the nominal cost ($300) of the foreclosed second mortgage, the cost of foreclosure and the $900 they paid on the first mortgage — a total of $2,200; about 10% of plaintiff’s $22,157 payments. The trial court found all this in detail and upon substantially undisputed evidence.
A similar arrangement had existed before 1947 between defendants and Harold, the deceased brother of the plaintiff, and Mrs. La Van, pursuant to which Harold farmed the land. But this, too, was summarily terminated by defendants, according to the testimony of Harold’s widow in support of plaintiff’s cause of action.
Defendants have had the undoubted advantage of tax-free use of the most valuable portion of the land where they lived and the much greater advantage of the liquidation of their mortgage debt. • They would, if they win this lawsuit, get free all the benefits of plaintiff’s labor and improvements.
The court’s opinion states that plaintiff’s total expenditures for the period in issue “ were $1,500 less than the established fair rental value of the property ’ ’. If the record is looked at in full perspective, it will be seen the statement throws the controversy out of accurate focus.
The real estate appraiser called by defendants testified to a radical difference in rental value of the farm in 1947 and in 1960 when the mortgage was finally paid off. From 1947 to 1949, this witness stated, the rental value of the tillable portion of the farm was $3 an acre; from 1950 to 1957, $5 an acre, and from 1957 to 1960, $6 an acre.
Therefore, at the time when plaintiff was making the largest mortgage amortization and interest payments, the rental value of the farm was at its lowest and the checks and other exhibits indicate that plaintiff was paying in taxes, mortgage amortiza *139 tion and improvements in this initial period more than the defendants’ real estate witness said was the annual fair rental value of the farm.
The estimated rental value of the 130 tillable acres in 1947 was placed by defendants’ witness at $390, and of the improvements at $150 a year — a total of $540. The real estate appraiser lumped together for the whole period the rental value of an apple orchard at $3,800 for 18 years, although he testified that such value, like the other items, “ varied ”. If this rental value follows a variable ratio similar to other elements, a rental value of about $100 is suggested for the first year.
Plaintiff established he paid $344.29 in taxes in 1947, the greater part of which ($266.62) his record shows was for taxes on the part of the property occupied by defendants (check No. 84 of September, 1947); and for the first year paid $490 on mortgage amortization and interest and installed a new roof on the barn for $300.
His entire expenditure of $1,134.29 accordingly was well in excess of all the rental value ($640) attributed by defendants to the premises at that period.
A sensible man would not make a farm deal which would cost him more than the rental value of the farm unless in the long run what he put into it would become his.
The Trial Judge noted, additionally, that while the rental value of the premises had greatly increased during the period in issue no attempt was made by defendants ‘‘ to increase the alleged rental payments of the plaintiff ”, a circumstance which the court believed tended to establish plaintiff’s contention his occupancy was in pursuance of a contract of sale. Of course, as the rental value increased during the years plaintiff’s equitable right in the premises also increased through his expenditures.
Concededly, the main house and garage and lot occupied by defendants constituted the most valuable part of the whole premises and the tax records kept by plaintiff show, year after year, the larger portion of his payments was for taxes on defendants’ part of the premises.
The specific separable attribution by plaintiff on his check for taxes of part of the very first tax bill paid in 1947 to the *140 separable interest of defendants and of himself in the tax liability on the land was, consistently with the Special Term’s findings, not the act of a tenant but of the owner of a beneficial interest. Not only did .it have contemporary significance at the opening of the transaction, it was continued regularly in the later tax payments and affords full support to the decision of the Trial Judge.
The court’s opinion also notes that “plaintiff listed his expenditures for the payment of taxes arid the mortgage as rent on his income tax returns ”. The returns show in the printed categories under “farm expenses” an item for “rent”; but they also show items for “taxes” and for interest on farm “ mortgages ”.
Plaintiff testified that defendant Robert La Van had “helped” him with his tax returns before 1947 and for that year told plaintiff that as to the mortgage payments (apparently amortization) plaintiff could “ put it down ” for “ rent ”.
This is not denied by defendant Robert La Van; nor are any of defendants’ own income tax returns in evidence to reflect how they treated the payments which they suggest were for “ rent ”, rather than capital payments. The weight to be given to the effect of income tax allocations is, under the present record, entirely a matter of factual evaluation and that evaluation has been made for the plaintiff. A different weighing of evidence is not open in this court.
The total equities under the findings of the Special Term lie heavily with plaintiff. It is difficult to escape the conclusion that defendants, relying on a legal title, have taken unconscionable advantage of him which equity ought not sanction.
As Chief Judge Parker noted in Canda v. Totten (157 N. Y. 281, 288): “ [E]quity will not permit the Statute of Frauds to be made an instrument of fraud ”. There, the trial court found on the basis of testimony defendant had received the consideration intended to be given under an oral agreement to obtain title by bid and to convey • it to plaintiff. Conveyance was decreed.
This court is not reaching, and, within the frame of its jurisdiction, cannot reach a factual conclusion that the agreement *141 was not made as found at Special Term and affirmed. Nor is it equitable to say that if the agreement was as the Supreme Court has found it to have been, a court should not intervene to avoid the literal application of the statute. If the truth is that the agreement was what it has been found to be, it would be grossly inequitable to give judgment for defendants.
The basis of decision against the plaintiff in this court, therefore, is that the acts of the plaintiff in performance—liquidation of the mortgage, payment of the taxes, improvement of the farm—were not reliably enough related to the land and the agreement to make it safe and proper to grant plaintiff equitable relief. It is useful, then, to examine closely the test of relationship between agreement and performance as it has been applied to actual cases, i.e., in what situation terms like “ unequivocally referable ” to the agreement were used and how they were used.
It has been seen that in Burns v. McCormick (supra) the acts of plaintiffs in going to live with the decedent had no palpable relation to the land. The fact that it could be readily said there the acts did not reliably connect up with an agreement to grant title is no true precedent for a proper decision of this present case.
And in Woolley v. Stewart (222 N. Y. 347, supra) there was a difference between the findings of the Special Term and the Appellate Division (see 169 App. Div. 678, 685) and it was possible for this court to say that the findings of the Appellate Division were unsupported (p. 353). The result there was based on a catalogue of circumstances recited in the opinion of Couuur, J. (p. 353) having no pertinence to the present case; and decision turned also on additional and unrelated grounds which were the only ones in which Judge Cardozo concurred.
Nor do any of the other cases cited by the court in support of a judgment for defendants deal with any comparable equitable situation. George v. Dobson (287 N. Y. 675) and Kezer v. Seely (236 N. Y. 567), for examples, like Burns v. McCormick, were based on claims of merely going to live with the owner as a consideration for a future conveyance, situations which, of course, are not independently referable to the land or to an agreement to convey.
*142 The decision in Rosen v. 250 West 50th St. Corp. (296 N. Y. 567) related to a purported agreement for a new lease, arrangements for which are governed by very different criteria from the arrangement concerning title to farm land considered here.
Nor is Gracie Sq. Realty Corp. v. Choice Realty Corp. (305 N. Y. 271) in point. There, plaintiffs asserted an oral contract for a perpetual easement. It was held there was no resulting equitable easement where claimant had no possession or use of the land and had made no improvements — just the converse of the present case.
In Sleeth v. Sampson (237 N. Y. 69) an entirely different kind of question was considered: whether the deposit of a deed and abstract of title papers for examination pending the drawing up of a mortgage could itself amount to a lien on the real property. The delivery of such papers was regarded by the court as ‘ ‘ ancilliary or preliminary ’ ’ to performance (p. 74)._
Nor is Neverman v. Neverman (254 N. Y. 496) decisive. There, a son (and builder) erected a house on his mother’s land almost entirely with the mother’s money, but with some small amount contributed by himself, and, thereafter, collected the rent. The fact the son was a beneficiary of the mother’s will was regarded as a sufficiently reasonable explanation for his acts without reference to an agreement to convey to him “ on her death ”.
This present case, then, assuming the findings of the Special Term and the Appellate Division are correct, discloses a strongly supported equitable ground for relief. It is not enough for the court to say that the performance here established, although “consistent with such an agreement” to convey, is also and ‘ ‘ equally ’ ’ inconsistent with it. That is a factual value judgment within the power of the Supreme Court and not within this court’s jurisdiction. It takes more than this kind of balance to justify interference with affirmed findings and, indeed, fairly viewed, the record is not in such a state of balance.
With some inconsistency, it would seem, the court is accepting the finding of the trial court that the contract was reliably enough established factually (“ unequivocally referable ” to the agreement) to make it possible as a matter of law for the *143 Special Term to grant plaintiff another kind of equitable relief: reimbursement for “ enhanced * * * value” of the property due to plaintiff’s improvements. Neither side has argued for such a result as this.
It is not easy to understand how the proof could be good enough to underpin one equitable remedy and not the other. If plaintiff was a mere tenant, as the court seems to believe, there is no equitable ground whatever to give him the value of improvements. If he was there under the agreement that has been found at Special Term, appropriate equitable relief should be accorded.
When this court, in one of those rare instances in which it can deal with facts, had before it a claim of oral contract for purchase and sale of a farm, followed by occupancy and payment to the owner regularly of part of the occupant’s milk checks, the court accepted the factual, as well as the legal sufficiency of the occupant’s claim of a valid oral agreement to convey, and, reversing the Appellate Division, sustained the findings of the Official Referee (Roberts v. Fulmer, 301 N. Y. 277). The court indulged in no such restrictive view of the equitable remedy as it is now suggesting. The present case is far stronger on its proof and on its merits than that one.
The order should be affirmed, with costs.
Chief Judge Fuld and Judges Scileppi and Breitel concur with Judge Keating ; Judge Bergan dissents and votes to affirm in a separate opinion in which Judges Burke and Jasen concur.
Order reversed, without costs, and case remitted to Supreme Court, Niagara County, for further proceedings in accordance with the opinion herein.